**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Lynn Dale BOGART, Edward Elbert**
**Wingender, Teodaro Risquez,**
**Defendants-Appellants.**

Nos. 85–5110, 85–5112 and 85–5115.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 6, 1986.

Decided March 4, 1986.

John Heisner, Special Asst. U.S. Atty., argued; Peter K. Nunez, U.S. Atty., John Heisner, Special Asst. U.S. Atty., on the brief, San Diego, Cal., for plaintiff-appellee.

John S. Moot, Federal Defender, Michael McCabe, San Diego, Cal., Michael S. Meza, Cerritos, Cal., for defendants-appellants.

Before FARRIS, PREGERSON, and NORRIS, Circuit Judges.

PREGERSON, Circuit Judge.

Lynn Dale Bogart and Edward Elbert Wingender pled guilty to conspiring to possess cocaine with intent to distribute and to the unlawful use of a communications facility. Teodaro Risquez pled guilty to attempting to possess cocaine.

Bogart and Wingender contend that the government's conduct was so outrageous that it violated their due process rights. The district court held an evidentiary hearing and rejected the defendants' outrageous governmental conduct claim, but made no findings of fact. Bogart and Wingender also argue that the district court, in denying their outrageous governmental conduct claim, erred by using a subjective rather than an objective standard. Risquez appeals the district court's refusal to sentence him to probation on a narcotics "diversion" program.

We remand Bogart's case to the district court for findings of fact on the nature of, and motivation for, the government's conduct. Without the benefit of clear findings of fact, we do not have an adequate record upon which to decide the merits of Bogart's appeal in this particularly fact-oriented area of the law.

We affirm the convictions of Wingender and Risquez because they do not have standing to contest the constitutionality of the governmental conduct directed towards Bogart. However, we remand Risquez' case to the district court for re-sentencing.

## FACTS

From a careful review of the undisputed assertions in the briefs submitted to us, we have been able to construct the following chronology of the essential events that produced the prosecution.

Kathleen Thaxton, a San Diego police officer and specially designated United States Marshal, investigated Lynn Dale Bogart in relation to an alleged real estate fraud scheme. Steven Bartlett, a criminal investigator with the County Attorney's office in Salt Lake County, in Utah, also investigated Bogart in relation to a similar fraudulent real estate scheme in Salt Lake City, Utah. After May 1983, Thaxton and Bartlett exchanged information on Bogart. At this time, Bogart and Ralph LaQuay

were involved in several joint business ventures in Southern California, notably a venture to market posters of past presidential election campaigns.

Between September 20, 1983 and March 1, 1984, Salt Lake County authorities arrested Bogart on four occasions on charges whose merits are open to question. Except for two days, Bogart remained in custody in Salt Lake City awaiting trial on these various charges from October 25, 1983 until March 16, 1984 when a federal grand jury in San Diego indicted Bogart, Wingender, and Risquez on the narcotics conspiracy charges at issue in this appeal. Throughout this period, Bogart was unable to post bail that, at different times depending on the charges pending, varied from $50,000 to $400,000.

During a concededly unlawful search of Bogart's hotel room in Salt Lake City, Investigator Bartlett first encountered LaQuay. Later in San Diego, Officer Thaxton spoke to LaQuay who then decided to become a paid police informant. Beginning on November 15, 1983, Thaxton taped a series of calls between LaQuay and Bogart and between LaQuay and Wingender. LaQuay, acting on Thaxton's instructions, informed Bogart that he had secured an order for a substantial number of posters, and requested Bogart to arrange with the source of the posters to deliver the necessary quantity to LaQuay in San Diego. Later, when the posters necessary to meet the requirements of the fictitious customer were about to be delivered, LaQuay, again acting on Thaxton's instructions, told Bogart that he, LaQuay, could not pay the posters' supplier. At this time, LaQuay, at Thaxton's instruction, told Bogart, untruthfully, that all of LaQuay's money was tied up in eight ounces of cocaine.

During a week of taped telephone conversations, Bogart indicated his pressing need for the proceeds of the posters' sale to pay his bail. He indicated an unwillingness to bring narcotics into what he considered to be a legitimate business transaction, but also represented to LaQuay that, through sources in Salt Lake City, he could dispose of the cocaine to produce the money necessary to fund the posters' transaction. LaQuay, on Thaxton's instructions, resisted any delivery of the cocaine to Salt Lake City. Eventually, LaQuay and Bogart agreed to swap 3500 posters directly for five ounces of cocaine. Whether Bogart or LaQuay proposed the swap is a matter of sharp contention between the defendants and the government.

Acting on Bogart's instructions, Wingender arranged for LaQuay to give the cocaine to Risquez in exchange for the posters at a restaurant in Encinitas, California. After completing the exchange, Risquez was arrested as he left the restaurant with the package containing what he believed to be cocaine.

Bogart and Wingender argue that the government's conduct was so outrageous that it violated their due process rights. Their argument runs as follows: Officer Thaxton and Investigator Bartlett enlisted LaQuay's assistance to obtain information against Bogart on the real estate fraud. To place pressure on Bogart, Thaxton and Bartlett collusively engineered a series of meritless arrests and excessive bail requests that kept Bogart in continuous custody for an extended period. Unable to obtain any incriminating evidence against Bogart relating to real estate fraud, Thaxton determined to secure Bogart's conviction by manufacturing a narcotics transaction. Using LaQuay, Thaxton invented a fictitious poster customer to provide Bogart with the potential means to meet his enormous bail. Thaxton then introduced cocaine into the scheme as the only way in which LaQuay could consummate the fictitious posters' sale. Thaxton instructed LaQuay to propose the direct switch of the posters for the cocaine, and to resist Bogart's attempts to dispose of the cocaine in any other way. Thus, the defendants argue, the prosecutions are entirely the product of Thaxton's vindictive and deliberate scheme to secure Bogart's conviction at any cost.

The government denies that Thaxton and Bartlett acted collusively. The government

argues that the charges against Bogart were the result of the independent activities of Salt Lake County authorities and that the high bail requests were either proper or the result of "clerical mistake." The fictitious posters' customer was introduced to assure Bogart that LaQuay was actively pursuing their joint business interests and to alleviate any suspicion Bogart might have that LaQuay was assisting the authorities. The cocaine scheme, according to the government, was not designed originally to catch Bogart but to trap a corrupt prison guard at Salt Lake County Jail with whom Bogart had struck up a relationship. The government expected Bogart to send the guard to pick up the cocaine. Instead, Bogart insisted on involving Wingender, and the government had to go along with this arrangement or risk exposing its stratagem. The proposal to swap the posters directly for the cocaine came from Bogart, and the actual exchange was planned by Bogart and executed by Wingender and Risquez.

At trial, Bogart and Wingender moved to dismiss their indictments on the ground that the government's conduct was so outrageous that prosecuting the crime violated their due process rights. The district court conducted an evidentiary hearing on the defendants' motion to dismiss. The court made no findings of fact. Denying the motion, the district court concluded:

> I was prepared, Mr. Moot, [Federal Public Defender] to deny your motion out of hand, but *you came as close to convincing me, or much closer to convincing me that your motion ought to be granted than any motion of that type that I've heard in fourteen years....* I really am concerned, Mr. Heisner [U.S. Attorney]; I think probably, and it's probably the way I am going to go, is that it is not to the extent that it's dismissible at this time, but *certainly there is an enormous issue of entrapment, and if it were not for what I understand Mr. Bogart's background to be and the admissibility of all that criminal background, I suspect the jury would walk*

> *him out in a minute on the entrapment defense ... I really do not approve of the conduct of the government in this case, but I do not feel that it rose to the level of outrageous conduct.* My problem with the government as far as Mr. LaQuay is concerned starts with the mention of cocaine, the eight ounces of cocaine on the 20th of February, or the 24th, whichever it was, but I say, I do not approve of the government's conduct in that regard, but deny the motion.

The defendants entered conditional guilty pleas under Fed.R.Crim.P. 11(a)(2). Bogart and Wingender pled guilty to violations of 21 U.S.C. §§ 846 and 841(a)(1) (possession with intent to distribute controlled substances), and seven violations of 21 U.S.C. § 843(b) (unlawful use of communications facility). Risquez pled guilty to attempting to possess a controlled substance in violation of 21 U.S.C. § 846. The court sentenced Bogart to four years imprisonment, Wingender to five years probation and six months imprisonment, and Risquez to two years probation. The court rejected Risquez's application for diversion under 21 U.S.C. § 844(b)(1). All three defendants timely appealed.

## STANDARD OF REVIEW

Whether the government's conduct is so outrageous as to constitute a violation of due process is a question of law. *United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir.1983). We review questions of law *de novo*. *Christensen v. United States*, 755 F.2d 705, 707 (9th Cir.1985).

## DISCUSSION

I. *Due process defense for outrageous government conduct*

A.

In *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Supreme Court reaffirmed the "subjective view" of entrapment as the rule in

federal courts.[1] However, the Court left open the possibility of an objective constitutional defense based on due process:

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed.... The law enforcement conduct here stops far short of violating that "fundamental fairness, shocking to the universal sense of justice" mandated by the Due Process Clause of the Fifth Amendment.

*Id.* at 431–32, 93 S.Ct. at 1642–43 (citation omitted), (quoting *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 303, 4 L.Ed.2d 268 (1960)).

The existence of a constitutionally based outrageous conduct defense was called into question in *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976).[2] The *Hampton* plurality concluded that the defendant's predisposition to the crime would bar an outrageous conduct defense. *Id.* at 490, 96 S.Ct. at 1650 (Rehnquist J., joined by White J. and Burger C.J.). Justices Powell and Blackmun concurred in the result but stated their view that a due process outrageous conduct defense *would* be available in an appropriate case, although "[p]olice overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." *Id.* at 495 n. 7, 96 S.Ct. at 1652 n. 7 (Powell J., concurring). The

three dissenters[3] reaffirmed their belief in the objective entrapment rule and would have held that the police conduct was sufficiently offensive to bar Hampton's conviction. *Id.* at 497, 96 S.Ct. at 1653 (Brennan J., dissenting, joined by Stewart J. and Marshall J.). Thus, a majority of the court recognized the potential availability of an outrageous police conduct defense no matter what the defendant's criminal predisposition.

■ We have repeatedly held that the due process outrageous conduct defense "survived the Court's review in *Hampton.*" *United States v. Bagnariol,* 665 F.2d 877, 882 (9th Cir.1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982). *See also United States v. So,* 755 F.2d 1350, 1353 (9th Cir.1985); *United States v. Ramirez,* 710 F.2d 535, 539 (9th Cir.1983); *United States v. Lomas,* 706 F.2d 886, 890–91 (9th Cir.1983), *aff'd on remand,* 723 F.2d 649 (9th Cir.) (per curiam), *cert. denied,* 464 U.S. 1047, 104 S.Ct. 720, 79 L.Ed.2d 182 (1984); *United States v. Wylie,* 625 F.2d 1371, 1377 (9th Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *United States v. McQuin,* 612 F.2d 1193, 1196 (9th Cir.), *cert. denied,* 445 U.S. 955, 100 S.Ct. 1608, 63 L.Ed.2d 791 (1980); *United States v. Prairie,* 572 F.2d 1316, 1319 & n. 3 (9th Cir.1978); *United States v. Ryan,* 548 F.2d 782, 789 (9th Cir.1976), *cert. denied,* 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977); *United States v. Gonzalez-Benitez,* 537 F.2d 1051, 1055 (9th Cir.), *cert. denied,* 429 U.S. 923, 97 S.Ct. 323, 50 L.Ed.2d 291

---

**1.** The subjective view of entrapment will exonerate a criminal defendant who would not have committed the offense but for the government's suggestive conduct. Under this view, a showing that the defendant is predisposed to the crime will defeat an entrapment defense. *See Russell,* 411 U.S. at 429, 93 S.Ct. at 1641 (plurality opinion) (The entrapment defense focuses on "the intent or predisposition of the defendant to commit the crime."). Here the predisposition of all three defendants to narcotics trafficking and use is apparent from the record, and thus bars any entrapment defense.

On the other hand, the objective view of entrapment concentrates on the government's conduct. *See Russell,* 411 U.S. at 440–45, 93 S.Ct. at

1646–49 (Stewart J., dissenting). Several states recognize both the objective and subjective views concurrently. *See, e.g., Cruz v. State,* 465 So.2d 516, 520–21 (Fla.), *cert. denied,* — U.S. ——, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985); *State v. Molnar,* 81 N.J. 475, 484, 410 A.2d 37, 41 (1980).

**2.** Strictly speaking, an assertion of outrageous conduct against the government is not a "defense" because, if successful, it results in the dismissal of the indictment whatever its merits. Since most courts identify it as a "defense," that nomenclature is used here.

**3.** Justice Stevens did not participate in the case.

(1976). We now reaffirm once again that a defendant may raise a due process-based outrageous government conduct defense to a criminal indictment.

## B.

▮▮▮ Bogart was the target of the government's activity here. He, therefore, has standing to contest his conviction on the grounds that the government's conduct was so outrageous that it violated his due process rights. *United States v. Payner*, 447 U.S. 727, 737 n. 9, 100 S.Ct. 2439, 2447 n. 9, 65 L.Ed.2d 468 (1980). Neither Wingender nor Risquez[4] were the targets of the government's conduct. A defendant does not have standing to raise a due process violation suffered by a third party. *United States v. Valdovinos-Valdovinos*, 743 F.2d 1436, 1437 (9th Cir.1984) (per curiam), *cert. denied*, — U.S. —, 105 S.Ct. 799, 83 L.Ed.2d 791 (1985).

In *Valdovinos*, the defendant transported illegal aliens from Mexico. The San Francisco INS office created a "cold line" whose number was disseminated throughout Mexico. Mexican citizens called the cold line collect from Mexico believing that they were speaking to American employers. The INS agent receiving the call advised the caller that it was appropriate to enter the United States without papers, and offered a reward to the person transporting the illegal entrants into the country. The INS arrested the "transporter" and deported the aliens. The district court dismissed the indictments against the transporter because the INS' advice to aliens to enter the United States illegally constituted outrageous conduct. We reversed, holding that the transporter had no standing to raise a due process defense based on the INS' operation of the cold line. *Id.* at 1438. Only the aliens who were encouraged by the INS to enter illegally would have standing. *Id.* at 1437–38.

The relationship of Wingender and Risquez to the conduct of the government agents here is considerably more tangential than the relationship of the transporter in *Valdovinos* to the cold line. In *Valdovinos*, the cold line, which constituted the outrageous conduct, was devised to trap transporters like Valdovinos-Valdovinos. The involvement of Wingender and Risquez here was incidental to Officer Thaxton's alleged plan to trap Bogart. Moreover, there is no dispute that the government agents repeatedly sought to dissuade Bogart from involving Wingender in the crime. In any event, it is clear that, for Wingender and Risquez, involvement in the crime was wholly voluntary criminal behavior.

Thus, neither Wingender nor Risquez have standing to contest the government's conduct as unconstitutional, and we affirm their convictions.

## C.

The defendants are incorrect when they contend that the district court applied the wrong legal standard to their motion to dismiss for outrageous governmental conduct. The district court clearly recognized that an outrageous conduct defense is analyzed using a standard different from that employed in considering an entrapment defense. The court properly observed that Bogart's subjective criminal predisposition barred a successful entrapment defense. By contrast, in evaluating the outrageous conduct defense, the court correctly reviewed the government's conduct objectively without regard to Bogart's predisposition.

▮▮▮ Nonetheless, we must remand Bogart's case to the district court. The district court made no findings of fact. This is a case where the outcome ultimately turns upon which of two sharply conflicting explanations for an otherwise undisputed sequence of events is correct. The conclusions of the trier of fact who viewed the

---

**4.** Risquez apparently did not join the motion to dismiss for outrageous conduct in the district court, nor does he press this claim on appeal.

witnesses' demeanor, and heard the nuances and inflections of the voices on the tapes of the phone conversations, are an essential aid to appellate review. The inferences as to Officer Thaxton's intent to be drawn from the elaborate circumstances that led up to the transaction at issue here are a matter of considerable dispute between Bogart and the government. It is not appropriate for an appellate court to conduct, from an incomplete and purely paper record, the sort of detailed fact-finding and inferential conclusions that are essential to the resolution of Bogart's appeal. The truth of Bogart's argument that the government's conduct was unconstitutionally impermissible depends crucially on determinations: (1) of the credibility of Thaxton and Bartlett as witnesses; (2) of the veracity of contradictory testimony concerning Bartlett's arrests of Bogart and requests for bail; and (3) of whether an apparently parallel series of events in San Diego and Salt Lake City was coincidental in whole or in part, or the product of collusion between government agents. Those determinations can only be made, in the first instance, by the district court, not by an appellate court.

While we conduct a *de novo* review in determining outrageous conduct and other appeals on constitutional matters, our *de novo* review is limited to determining whether particular government behavior is or is not, as a matter of law, a constitutional violation. *See United States v. McConney*, 728 F.2d 1195, 1200–01 (9th Cir.) (en banc), *cert. denied*, —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Because of the trier of fact's unique advantage in seeing and hearing the presentation of evidence, we will accept as correct his or her determination of what was the particular government behavior and what prompted that behavior, unless those factual conclusions are clearly erroneous. *Id.* Of course, there may be occasions when the factual nature of the government's conduct is not disputed, or, perhaps, is very obvious or straightforward. Then, an appellate court may be able to resolve the appeal without the benefit of findings of fact by the district court. Manifestly, this is not one of those occasions, and thus, in the absence of any findings of fact by the district court, a remand is unavoidable.

### D.

A summary of the present case law in this difficult area may assist the district court on remand in resolving the merits of Bogart's due process defense for outrageous governmental conduct.

Only two circuits have dismissed an indictment in response to a due process outrageous governmental conduct defense. *Greene v. United States*, 454 F.2d 783 (9th Cir.1971) (predating *Hampton* and *Russell*); and *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978).[5] In addition, one district court in this circuit has applied the defense. *United States v. Batres-Santolino*, 521 F.Supp. 744 (N.D.Cal.1981). As we have acknowledged, "the due process channel which *Russell* kept open is a most narrow one." *Ryan*, 548 F.2d at 789.

In *Hampton*, Justice Powell stated that due process rights would be violated only by governmental conduct of a "demonstrable level of outrageousness." 425 U.S. at 495 n. 7, 96 S.Ct. at 1652 n. 7 (Powell J., concurring). The *Russell* majority indicated that governmental conduct would be constitutionally impermissible only where it

---

5. In *United States v. Beverly*, 723 F.2d 11, 12 (3d Cir.1983) (per curiam) the Third Circuit called into doubt the legal reasoning upon which *Twigg* was based. However, in *United States v. Jannotti*, 673 F.2d 578, 607–10 (3d Cir.) (en banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982) a plurality of the court sitting en banc reaffirmed the continued vitality of *Twigg*. *See id.* at 610 n. 17 (three of the seven members of the majority would overrule *Twigg*).

In *United States v. Lard*, 734 F.2d 1290 (8th Cir.1984), the Eighth Circuit dismissed the indictment on the grounds of entrapment. In an alternative holding, the court held that the agent's "overinvolvement in conceiving and contriving the crimes here approached being 'so outrageous that due process principles should bar the government from invoking judicial processes to obtain a conviction.'" *Id.* at 1296 (quoting *Russell*, 411 U.S. at 431–32, 93 S.Ct. at 1642–43).

went beyond "that 'fundamental fairness, shocking to the universal sense of justice.'" 411 U.S. at 432, 93 S.Ct. at 1643. As the Third Circuit has aptly observed, the determination of when the government's behavior reaches such a "demonstrable level of outrageousness" to constitute a due process violation is "at best elusive." *United States v. Jannotti,* 673 F.2d 578, 606 (3d Cir.) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).[6] Similarly, the precise parameters of such concepts as "fundamental fairness" and "universal sense of justice" are probably indefinable. Perhaps because of these very considerable problems of philosophy and semantics, no federal court has defined with any sort of precision the contours of the outrageous conduct defense.[7]

In determining whether particular governmental conduct is sufficiently outrageous that it implicates constitutional concerns, a court must take especial care not to permit the objective analysis of the due process defense to swallow the subjective entrapment rule. The Third Circuit in *Jannotti* attempted to resolve this problem of linedrawing by, correctly, viewing the outrageous conduct defense as the nether end of a continuum of police behavior:

It is plain from the Court's opinion in *Russell* and the separate opinions in *Hampton,* however, that a successful due process defense must be predicated on intolerable government conduct which

goes beyond that necessary to sustain an entrapment defense.... We must necessarily exercise scrupulous restraint before we denounce law enforcement conduct as constitutionally unacceptable; the ramifications are wider and more permanent than when only a statutory defense [entrapment] is implicated. We must be careful not to undermine the Supreme Court's consistent rejection of the objective test of entrapment by permitting it to reemerge cloaked as a due process defense. While the lines between the objective test of entrapment favored by a minority of the Justices and the due process defense accepted by a majority of the Justices are indeed hazy, the majority of the Court has manifestly reserved for the constitutional defense only the most intolerable government conduct.

*Id.* at 607–08.

Following this analytical approach a number of courts have read Supreme Court precedent to confine the broad due process check on the conduct of law enforcement officers only to that slim category of cases in which the police have been brutal, employing physical or psychological coercion against the defendant. *See United States v. Kelly,* 707 F.2d 1460, 1476 n. 13 (D.C. Cir.) (per curiam) (citing cases) (reversing district court dismissal for outrageous conduct in an ABSCAM case), *cert. denied,* 464 U.S. 908, 104 S.Ct. 264, 78 L.Ed.2d 247

---

**6.** *Jannotti* was the principal appeal in the so-called ABSCAM cases. The ABSCAM inquiry was an undercover FBI operation in which government agents posed as associates of a rich Middle Eastern businessman who wished to secure preferential treatment for his investments in the United States by bribing members of Congress and other highly influential citizens. The "businessman" and his "investments" were fictitious. The government used a habitual swindler to bring formerly law-abiding people into contact with the "agents" of the corrupt "businessman."

The district court had set aside a jury verdict for the government on a number of grounds including entrapment and outrageous conduct by the government.· Relying on the jury's finding of no entrapment, the Third Circuit en banc reversed the district court's due process ruling.

673 F.2d at 610. The en banc court reversed all the conclusions of the district court and reinstated the jury's guilty verdict. *Id.* at 611.

**7.** The New York Court of Appeals has suggested a four factor test for overturning a conviction on due process grounds: (1) whether the crime would not have occurred but for the government's assistance in manufacturing the crime or whether the defendants were already involved in ongoing criminal activity; (2) whether the government agents committed crimes or otherwise acted improperly; (3) whether the government agents persisted with their inducements to overcome the defendant's reluctance to commit the crime; and (4) whether the government agents' sole motive was to obtain a conviction. *See People v. Isaacson,* 44 N.Y.2d 511, 521, 378 N.E.2d 78, 83, 406 N.Y.S.2d 714, 719·(1978).

(1983). This narrow definition of what constitutes outrageous government behavior relies on the *Russell* Court's citation to *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) as an example of the type of government activity that would so "shock the conscience" that it would violate due process. 411 U.S. at 432, 93 S.Ct. at 1643. In *Rochin*, police officers broke into the defendant's bedroom, attempted to pull drug capsules from his throat, and finally forcibly pumped his stomach to retrieve the capsules. 342 U.S. at 166, 172, 72 S.Ct. at 206, 209. Relying on *Rochin*, we similarly found a substantive due process violation when border patrol officers forcibly removed narcotics packets from the defendant's rectum while he was held spreadeagled across a table by other officers. *Huguez v. United States*, 406 F.2d 366, 381 (9th Cir.1968).

We have not accepted the view that this highly discrete group of extreme cases of police brutality defines the limits of unconstitutionally outrageous governmental conduct. We have held that law enforcement conduct also becomes constitutionally unacceptable "where government agents engineer and direct the criminal enterprise from start to finish," *Ramirez*, 710 F.2d at 539; *So*, 755 F.2d at 1353, or when governmental conduct constitutes "in effect, the generation by police of new crimes merely for the sake of pressing criminal charges against the defendant." *Ramirez*, 710 F.2d at 540. This broader definition of unconstitutional outrageous conduct draws its inspiration from Justice Brandeis' eloquent dissent in *Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis J., dissenting):

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

Our view, shared by Justice Brandeis, that a crime manufactured by the government "from whole cloth" would constitute outrageous conduct also has a firm jurisprudential basis. Criminal sanction is not justified when the state manufactures crimes that would otherwise not occur. Punishing a defendant who commits a crime under such circumstances is not needed to deter misconduct; absent the government's involvement, no crime would have been committed. Similarly, a defendant need not be incarcerated to protect society if he or she is unlikely to commit a crime without governmental interference. Nor does the state need to rehabilitate persons who, absent governmental misconduct, would not engage in crime. Where the police control and manufacture a victimless crime, it is difficult to see how anyone is actually harmed, and thus punishment ceases to be a response, but becomes an end in itself—"to secure the conviction of a private criminal." *Id.* Under such circumstances, the criminal justice system infringes upon personal liberty and violates due process.

Our view that the outrageous governmental conduct defense reaches beyond the most egregious *Rochin*-type physical abuse cases also finds support in the case law. In each of the cases in which an outrageous conduct defense has succeeded, the government essentially manufactured the crime. In *Greene*,[8] an undercover

---

**8.** Although *Greene* predates *Russell*, it remains a useful precedent because in *Greene* we accurate-

agent re-established contact with the defendants after their previous arrest on bootlegging charges. For two years the agent was involved in the defendants' illegal still: offering to supply materials, an operator and location for the still, and actually supplying sugar at wholesale prices. The agent was the sole purchaser of the still's entire output. This court concluded:

> We do not believe the Government may involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators.... [W]hen the Government permits itself to become enmeshed in criminal activity, from beginning to end, to the extent which appears here, the same underlying objections which render entrapment repugnant to American criminal justice are operative.

*Id.* at 787.

In *Twigg,* a government informant contacted an old acquaintance to discuss setting up a laboratory to manufacture methamphetamine hydrochloride ("speed"). DEA agents provided the informant with the hard-to-obtain essential chemical ingredient for speed manufacture, twenty percent of the glassware and a rented farmhouse for the laboratory. DEA officials made arrangements with chemical supply houses to provide the other chemicals through a fictional business. The supplies were purchased with money supplied by the DEA. The laboratory operated for one week under the informant's direction. As the defendant left the farmhouse with the completed product, he was arrested. 588 F.2d at 375–76. The Third Circuit concluded that the defendant's "receptivity" to the informant's criminal proposal did not bar a due process defense, *id.* at 381, and held:

> This egregious conduct on the part of government agents generated new crimes by the defendant merely for the sake of pressing criminal charges against him when, as far as the record

reveals, he was lawfully and peacefully minding his own affairs. Fundamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution for a crime so fomented by them will be barred.

*Id.*

In *Batres-Santolino,* the DEA informant lured the defendants to Ecuador representing that he had access to a major source of cocaine. The informant also represented himself as having contacts with Ecuadorian government officials and proposed substantial legitimate and lucrative armaments and grain deals in which the defendants could become involved by using the profits from the cocaine deals. 521 F.Supp. at 746–50. Dismissing the subsequent narcotics indictment because of outrageous governmental conduct, the court concluded:

> Thus this is a case in which the government supplied all the drugs *and* defendants were not involved in a drug-related enterprise until the government agent came on the scene.... Although the defendants in this case are not without some culpability, they were not embarked or about to embark on any criminal activity until the government's agents set in motion the operation.

521 F.Supp. at 752 (emphasis in original).

By contrast to these three cases, the numerous cases *refusing* to apply the outrageous conduct defense invariably conclude that when the government conduct occurred the defendant was involved in a continuing series of similar crimes, or that the charged criminal enterprise was already in progress at the time the government agent became involved. In *Russell,* for example, the defendants were already engaged in the manufacture and sale of speed from a working laboratory when the government agent approached them as a supplier of an essential chemical for continuing production. 411 U.S. at 431–32, 93 S.Ct. at 1642–43. The Court concluded that the agents' participation was not necessary

---

ly anticipated the Court's pronouncements in *Russell* and *Hampton:* we dismissed the entrapment defense because of the defendant's predis-

position, and applied an objective outrageous conduct test to the government's behavior. 454 F.2d at 786–87.

to enable the defendants to continue their criminal activity. *Id.* at 431, 93 S.Ct. at 1642. *See also Hampton,* 425 U.S. at 487, 96 S.Ct. at 1648 (undercover agent supplied contraband to a known person who "admitted both soliciting and carrying out sales."); *So,* 755 F.2d at 1353 ("In this case, the creative inspiration for the charged crimes was provided by Lee, So, and Lam."); *Ramirez,* 710 F.2d at 540 ("The government did not create the crime—Reynolds and his associates did that."); *Wylie,* 625 F.2d at 1378 ("The agents were investigating a continuing large scale LSD manufacturing and distribution ring."); *Prairie,* 572 F.2d at 1319 ("[The agent's] role was limited to that of introducing a willing seller of narcotics to a willing purchaser.")

The outrageous governmental conduct defense involves a difficult area of the law. Drawing a bright line with any degree of assurance is fraught with problems. The point of division at the margins between police conduct that is just acceptable and that which goes a fraction too far probably cannot be usefully defined in the abstract. Ultimately, every case must be resolved on its own particular facts. However, some general observations are possible.

As a matter of general principle, we have recognized that, in order to apprehend those engaged in serious crime, government agents may lawfully use methods that are neither appealing nor moral if judged by abstract norms of decency. *See Rochin,* 342 U.S. at 172, 72 S.Ct. at 209 (court should not judge police practices by relying on the " 'chancellor's' fastidious squeamishness or private sentimentalism."); *Hampton,* 425 U.S. at 494 n. 6, 96 S.Ct. at 1652 n. 6 (Powell J., concurring); *Ramirez,* 710 F.2d at 541. Generally, agents may use "artifice and stratagem to ferret out criminal activity." *Sorrells v. United States,* 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932). Specifically, the government may use informants and pay them. *See, e.g., Wylie,* 625 F.2d at

1378. When working undercover, may supply contraband to gain the defendant's confidence. *See, e.g., Russell,* 411 U.S. at 432, 93 S.Ct. at 1643. Agents may provide necessary and valuable items to further an existing conspiracy. *See, e.g., Lomas,* 706 F.2d at 890–91. The government may infiltrate a criminal organization. *See, e.g., United States v. Marcello,* 731 F.2d 1354, 1357 (9th Cir.1984). Government agents may approach people already engaged in or contemplating criminal activity. *See, e.g., United States v. O'Connor,* 737 F.2d 814, 817–18 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1198, 84 L.Ed.2d 343 (1985).

On the other hand, we have recognized that law enforcement conduct becomes constitutionally unacceptable when it "shocks the conscience." These will include situations where the police conduct involved unwarranted physical, or perhaps mental, coercion. However, also constitutionally unacceptable are those hopefully few cases where the crime is fabricated *entirely* by the police to secure the defendant's conviction rather than to protect the public from the defendant's continuing criminal behavior.

On remand, the district court should make findings of fact, and apply to those factual findings the objective legal guidelines that we have outlined here to determine if the government conduct was sufficiently outrageous to constitute a violation of Bogart's due process rights.

## II. *Risquez' Diversion Claim*

Risquez argues that the district court erred in not sentencing him, as a first offender, to conditional probation pursuant to 21 U.S.C. § 844(b)(1) ("diversion"). Such a sentence would, assuming Risquez fulfilled the conditions set by the court, expunge his conviction. Risquez fears that, if the conviction stands, he will be subject to deportation despite his present legal alien status. The district court held that as a matter of law, diversion was not available to Risquez.[9]

---

9. The district judge offered to sign a recommendation to the Immigration and Naturalization

Service that Risquez should not be deported because of the conviction alone.

The legality of a sentence is a question of law which we review *de novo.* *United States v. McCrae,* 714 F.2d 83, 84 (9th Cir.), *cert. denied,* 464 U.S. 1001, 104 S.Ct. 506, 78 L.Ed.2d 696 (1983). Sentencing which falls within statutory limits is a matter for the sentencing court's discretion, and we review the court's decision for an abuse of discretion. *United States v. Chiago,* 699 F.2d 1012, 1014 (9th Cir.), *cert. denied,* 464 U.S. 854, 104 S.Ct. 171, 78 L.Ed.2d 154 (1983).

21 U.S.C. § 844(a) prohibits possession of a controlled substance. Section 844(b)(1) permits a court to sentence a person convicted for the first time of possession to probation under certain conditions ("diversion").[10] If the offender fulfills the conditions, section 844(b)(2) permits the court to expunge the conviction.

When sentencing Risquez, the district court held that, because Risquez was convicted of attempted possession under 21 U.S.C. § 846,[11] he was not entitled to the benefit of diversion. Presumably, the court relied on the apparent limitation of diversion in section 844(b)(1) to a first conviction for possession under section 844(a). *See supra* note 10. Risquez argues that because attempted possession is a lesser included offense of possession, and because section 846 limits the penalty for attempt to the maximum sentence for the substantive crime, Congress could not have intended to limit diversion to actual possession alone. To do so, Risquez argues, would allow a court to punish him more for *attempting* to commit a crime than actually *committing* it.

No court has previously dealt directly with this issue. In *Bifulco v. United States,* 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980), the Supreme Court construed section 846 as it applies to a conspiracy conviction. The Court held that section 846 does not permit the imposition of the special parole term mandated by 21 U.S.C. § 843 for the substantive crime of manufacturing and distributing a controlled substance. *Id.* at 400, 100 S.Ct. at 2259. The Court emphasized that section 846 permits only "fines" and/or "imprisonment," *see supra* note 11, and that a special parole term fitted neither category. *Id.* at 388–90, 396–98, 100 S.Ct. at 2256–57. Diversion, similarly, seems to fall outside both of the categories enumerated in section 846, thus giving support to the district court's decision here.

However, *Bifulco* also noted that section 846 "sets identical penalties for conspiracies and attempts," 447 U.S. at 399, 100 S.Ct. at 2258. The Court observed that attempt is a lesser crime than the substantive offense and will invariably attract a lesser sentence than would the substantive crime. *Id.* Relying on the parallelism in section 846 between attempts and conspiracies, the Court concluded that Congress must have wanted also to permit a *lesser* sentence for conspiracy than for the substantive offense. *Id.* Thus, this part of the *Bifulco* opinion supports Risquez' argument that the statutorily available minimum punishment for the substantive crime—diversion and expungement—cannot be more lenient than the available minimum punishment for the inchoate crime, notwithstanding the reference to "fines" and "imprisonment" in the actual words of the statute.

**10.** 21 U.S.C. § 844(b)(1) states in pertinent part:
*If any person who has not previously been convicted of violating subsection (a) of this section,* any other provision of this subchapter or subchapter II of this chapter, or any other laws of the United States relating to narcotic drugs ... *is found guilty of a violation of subsection (a) of this section ...,* the court *may,* without entering a judgment of guilty and with the consent of such person, *defer further proceedings and place him on probation upon such reasonable conditions as it may require* and for such period, not to ex-
ceed one year, as the court may prescribe. (Emphasis added)

**11.** 21 U.S.C. § 846 states:
Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

The legislative history of the 1970 Drug Control Act indicates that diversion was included to further the Act's philosophy of, on the one hand, encouraging rehabilitation of the individual user and, on the other hand, imposing severe punitive sanctions on manufacturers and distributors of narcotics. *See* H.R.Rep. No. 1444, 91st Cong., 2d Sess., *reprinted in* 1970 U.S. Code Cong. & Ad.News 4566, 4617 ("The committee is confident that judges, in administering the provisions of [section 844], will recognize that many defendants coming before them will be in need of medical treatment and that judges will require that these persons undergo some form of prescribed treatment as a condition of their probation."). There is no evidence in the record before us on whether Risquez is a drug abuser who requires rehabilitative treatment.[12]

■ The resolution of this issue is not easy. However, we have noted carefully the Supreme Court's statement in *Bifulco* that attempt invariably warrants a lesser sentence than the substantive crime. *See* 447 U.S. at 399, 100 S.Ct. at 2258. Thus, we construe section 844(b) in the common-sense manner proposed by Risquez and hold that the more lenient sentence of diversion available for the substantive crime of possession is also available, at the sentencing court's discretion, for the inchoate crime of attempted possession. The district court should, therefore, have considered diversion in determining the appropriate sentence for Risquez. Thus, we remand Risquez's case to the district court for re-sentencing.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

---

12. We note that the district court indicated an apparent unwillingness to exercise its discretion, in any event, to grant diversion to Risquez. At Risquez's sentencing hearing, counsel for Risquez pressed Judge Nielsen to state whether if "the court felt it could exercise its discretion in that regard [to grant diversion], would it?" Transcript at 520. Judge Nielsen responded to this hypothetical question: "I don't think I would at this point." *Id.* Thus, it may be that the court would have denied diversion to Risquez even if it had believed that such a sentence was available. However, the court clearly believed that it could not as a matter of law sentence Risquez to diversion. In this situation, we do not consider the district court's offhand speculation as determinative of what the sentence would have been had Judge Nielsen believed that he did have the discretionary power to impose diversion on Risquez.