77 F.3d 490
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Gregory S. BREBNER, Defendant-Appellant.
 No. 95-30139.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 7, 1996.
Decided Feb. 14, 1996.
 
 Before: WRIGHT, HALL, and TROTT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 After the district court denied Gregory Brebner's motions to dismiss, he entered a conditional guilty plea to two counts of possession and six counts of distribution of cocaine, all in violation of 21 U.S.C. § 841(a)(1). On appeal, Brebner argues that the district court erred: (1) in denying his motion to dismiss based on outrageous government conduct; and (2) in not conducting an in camera review of certain documents he claims were required to be disclosed under Brady v. Maryland, 373 U.S. 83 (1963). We affirm.
 
 I.
 
 3
 In what came to be known as operation "doughboy," the FBI and the Spokane Regional Drug Task Force joined together to investigate a cocaine distribution ring in eastern Washington. To do so, they hired Hal Turner, a confidential informant, to infiltrate the ring. Turner posed as a courier or "gopher," whose job it was to carry drugs and money between various dealers. Turner was expected to tell the FBI about the ring's activities, including about new buyers; he often wore a wire.
 
 
 4
 In exchange, the FBI and Task Force reimbursed Turner's expenses (including rent, gas, and food), and also paid him for "services." The amount of these "services" payments depended on the amount of information he provided and on the amount of time he spent collecting it. Although Turner was only paid for "good information" and for the "results he achieved," the amount was never contingent on the conviction rate of those arrested, or on the quantity of drugs or assets seized pursuant to such arrests. He received no "bonuses" for his work.
 
 
 5
 As a gopher, Turner's superiors in the drug ring often tipped him for successfully delivering drugs and picking up payments; the size of the tip usually depended on the amount of drugs he delivered. Turner kept track of the tips in a diary, which he periodically handed over to the FBI. The FBI permitted Turner to keep the tips.
 
 
 6
 When Brebner learned of this payment practice, he moved to dismiss on the grounds that it constituted outrageous government conduct in violation of due process. During the pretrial hearing, Brebner requested that the government disclose certain documents bearing on Turner's payments. The district court denied his request for documents and ruled that, even if the documents were disclosed, the activities here did not violate due process. Brebner reserved the due process issue in his conditional guilty plea and now appeals.
 
 II.
 
 7
 Brebner argues that the FBI's tolerance of Turner's "tipping" income constitutes "outrageous government conduct." Specifically, he contends that because, under the current tipping custom, Turner could earn more in tips if he delivered larger amounts of cocaine, Turner had an incentive to promote innocent persons to buy cocaine just so he could deliver to them and thus make more in tips.[1] According to Brebner, the FBI had no reason to discourage Turner from doing this, since the more Turner earned in tips, the less the FBI had to pay him. In standing idly by, Brebner concludes, the FBI subsidized the very criminal activity it sought to prevent and was, in effect, permitting Turner to launder drug money.[2] This, he claims, is outrageous.
 
 
 8
 A defendant asserting outrageous government conduct claims "that the government conduct in securing an indictment was so shocking to due process values that the indictment must be dismissed." United States v. Montoya, 45 F.3d 1286, 1300 (9th Cir.), cert. denied, 116 S.Ct. 67 (1995) (citations omitted). Under this doctrine, an indictment should be dismissed "only when the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice." Id. (citations omitted); United States v. Garza-Juarez, 992 F.2d 896, 904 (9th Cir.1993), cert. denied, 114 S.Ct. 724 (1994); United States v. Russell, 411 U.S. 423, 431-32 (1973). It is difficult to meet this "extremely high standard." United States v. Smith, 924 F.2d 889, 897 (9th Cir.1991); Garza-Juarez, 992 F.2d at 904. In the twenty years since this doctrine was created, only a handful of federal courts have dismissed an indictment on these grounds. See United States v. Harris, 997 F.2d 812, 816 nn. 3 & 4 (10th Cir.1993) (listing cases where indictment was dismissed for outrageous government conduct).
 
 
 9
 This Circuit has thus far recognized two situations in which government conduct rises to the level of outrageousness: (1) when the government engages in brutal physical or psychological coercion, United States v. Bogart, 783 F.2d 1428, 1435 (9th Cir.), vacated on other grounds sub nom. United States v. Wingender, 790 F.2d 802 (9th Cir.1986) (vacating only as to another defendant); see United States v. Kelly, 707 F.2d 1460, 1476 n. 13 (D.C.Cir.), cert. denied, 464 U.S. 908 (1983) (listing cases involving brutal coercion); and (2) when government agents "engineer and direct the criminal enterprise from start to finish" so that the "conduct constitutes, in effect, the generation by police of new crimes for the sake of pressing criminal charges against the defendant," Bogart, 783 F.2d at 1436; Smith, 924 F.2d at 897; see United States v. Twigg, 588 F.2d 373 (3d Cir.1978) (dismissing indictment where government informant operated a drug laboratory and directed the defendant's minimal involvement in the lab's activities); Greene v. United States, 454 F.2d 783 (9th Cir.1971) (dismissing indictment where government officials reestablished and ran a criminal bootlegging operation).
 
 
 10
 Brebner argues that the FBI's treatment of Truner's supplemental tipping income falls into the latter category because it provided Turner with an incentive to manufacture crimes. He likens this situation to a contingent fee arrangement, of which many courts disapprove because it encourages informants to create crime in order to earn more pay. For support, Brebner cites two cases. He first cites Williamson v. United States, 311 F.2d 441, 445 (5th Cir.1963) ("Without some such justification or explanation [by the government], we cannot sanction a contingent fee arrangement to produce evidence against particular named defendants as to crimes not yet committed."). That case has been overruled. See United States v. Cervantes-Pacheco, 826 F.2d 310, 314 (5th Cir.1987), cert. denied sub nom. Nelson v. United States, 484 U.S. 1026 (1988) (overruling Williamson's rule that contingency fees are automatically outrageous).
 
 
 11
 Brebner next cites and then distinguishes United States v. Beard, 761 F.2d 1477 (11th Cir.), cert. denied, 474 U.S. 907 (1985). In Beard, the DEA hired a confidential informant and agreed to pay him a "reward based upon a review of all services rendered" after he had furnished investigative field services and testified truthfully in court. Id. at 1479-80. While providing these services, the informant "double-dealt" the government and, without the DEA's knowledge, received kickbacks from the drug dealers with whom he worked. Id. at 1481. The court held that the fee arrangement, even with the double dealing, did not amount to outrageous government conduct. Id. Brebner claims that the Beard court would have found the informant's conduct outrageous if the DEA had known of the informant's "double-dealing"; Turner's similar tipping activities, he argues, are likewise outrageous.
 
 
 12
 We are not persuaded. The Beard court never said that the DEA's knowledge of its informant's double-dealing would make that dealing outrageous; it only suggested that the DEA's knowledge of the dealing might have "jeopardized" the informant's reward from the DEA. Id. at 1481. Beard therefore harms Brebner more than it helps him.
 
 
 13
 Beard aside, the FBI's treatment of Turner does not in any event amount to outrageous conduct. To begin with, Turner's fee arrangement with the FBI provides him no incentive to create new crimes--his pay is not based on conviction rates, or on the quantity of drugs or assets seized. It is based solely on his ability to provide "good information" and on the time he spent gathering it. Such fee arrangements are valid. United States v. Sanchez, 790 F.2d 1561, 1564 (11th Cir.1986) (holding that an informant can be paid for "successful investigations in general," but not for successful prosecution of particular individuals); United States v. Edenfield, 995 F.2d 197, 200 (11th Cir.1993), cert. denied, 115 S.Ct. 76 (1994) ("We see nothing outrageous about the government's refusal to pay [the informant] part of his fee until he produced useful evidence."). Even if we assume that the combined effect of the FBI income and tips provided Turner an incentive to manufacture crimes, as a gopher who had no power to choose the amount or recipients of his distributor's cocaine, Turner was no position to act on that incentive and create any new crimes.
 
 
 14
 Brebner's claim is then reduced to the assertion that the government should not have permitted Turner to keep his tips because they were the proceeds of drug transactions. It is well settled, however, that the government's passive tolerance of an informant's shady conduct is not "outrageous." United States v. Barrera-Moreno, 951 F.2d 1089, 1092 (9th Cir.1991), cert. denied, 113 S.Ct. 417 (1992) ("Due process is not violated unless the conduct is attributable to and directed by the government. Passive tolerance ... of a private informant's questionable conduct [is] less egregious than the conscious direction of government's agents ...") (internal quotations and citations omitted); United States v. Simpson, 813 F.2d 1462, 1470 (9th Cir.), cert. denied, 484 U.S. 898 (1987) (allowing informant to use cocaine and engage in prostitution while gathering information); United States v. Szycher, 585 F.2d 443 (10th Cir.1978) (allowing government informant to use cocaine). Indeed, "governmental agents may lawfully use methods that are neither appealing or moral if judged by abstract norms of decency." Bogart, 783 F.2d at 1438. Because the FBI at most tolerated Turner's collection of fees, its passive conduct in this regard is not outrageous.[3]
 
 III.
 
 15
 Brebner next argues that the district court erred in rejected his request under Brady v. Maryland, 373 U.S. 73 (1963), for three documents: (1) Turner's diary recording when he received tips and their amounts; (2) the FBI's memorandum explaining whether payments to Turner were for expenses or services; and (3) the FBI's operations manual establishing a policy against permitting informants to keep tips. He claims that these documents would show that Turner received more tips than he claimed, which would have provided him greater motivation to manufacture new crimes.
 
 
 16
 The government claims that Brebner waived this claim because he did not specifically reserve it in his conditional guilty plea. Federal Rule of Criminal Procedure 11(a)(2) permits a defendant to enter such a plea "reserving in writing, the right, on appeal from judgment, to review of the adverse determination of any specified pretrial motion." Fed.R.Crim.P. 11(a)(2) (emphasis added). Issues not expressly reserved for appeal are deemed waived. United States v. Arzate-Nunez, 18 F.3d 730, 737 (9th Cir.1994); United States v. Echegoyen, 799 F.2d 1271, 1276 (9th Cir.1986). Because Brebner's plea reserved only "the right to appeal the court's adverse ruling to defendant's motion to dismiss based upon governmental misconduct filed November 4, 1994," and did not specifically reserve the right to review the adverse Brady ruling, the government argues that Brebner waived the Brady issue.
 
 
 17
 Brebner claims that the Brady issue can still be considered because he reserved the right to appeal his "outrageous conduct" motion to dismiss, and he raised the Brady issue during the pretrial hearing on that motion. Two cases marginally support Brebner's argument. In Arzate-Nunez, the defendant attempted to appeal a due process claim which he had failed to reserve in his conditional plea. Although the defendant's plea reserve only the right to appeal "his motion to dismiss filed February 26, 1991," the defendant had raised the due process claim orally at the hearing on that motion, the government's attorney had stated that defendant could appeal "all of those issues which he had raised in his motion to dismiss," and the court's order denying the defendant's motion had specifically referred to the due process claim. Arzate-Nunez, 18 F.3d at 737. The court found that these additional facts reserved the claim. Id. Similarly, the court in United States v. Bentz, 21 F.3d 37 (3d Cir.1994), permitted the defendant to appeal the issue of causation even though it was not mentioned in his conditional plea because the defendant raised the causation issue at the hearing on the reserved issue, and the court never distinguished between the reserved issue and causation issue during the hearing. Id. at 39.
 
 
 18
 We do not find these cases controlling, however. First, the courts in both Arzate-Nunez and Bentz relied upon more than the raising of an issue at oral argument to preserve the issue; here, that is the only factor present. Second, and more important, the unreserved issue in both of the above-cited cases constituted a separate and independent ground for reversing the guilty plea; in this case, Brebner's Brady claim was subsidiary to the outrageous governmental conduct issue--even if Brebner were given the documents he requested, he would not be entitled to reversal of his plea unless the information contained therein showed outrageous conduct. Because the purpose of a conditional plea is to permit appeal only on issues which might affect the plea (and are thus dispositive), see United States v. Carrasco, 786 F.2d 1452, 1454 (9th Cir.1986) (explaining the Rule 11(a)(2)'s writing requirement "enables the court to verify that the issues reserved for appeal are material to the disposition of the case") (emphasis added), we decline to stretch the boundaries of Rule 11(a)(2) to preserve Brebner's Brady claim when the district court found that full disclosure would still not enable Brebner to meet the "extremely high standard" of his outrageous conduct claim. We therefore conclude that Brebner has waived this issue.
 
 
 19
 Even if we assume that Brebner properly preserved his Brady claim, we find it without merit. Brady v. Maryland holds that "suppression by the prosecution of evidence favorable to the accused ... violates due process where the evidence is material either to guilt or punishment." Brady, 373 U.S. at 87. To make out a Brady claim, a defendant must show that: (1) the prosecution possesses evidence; (2) the evidence is exculpatory; and (3) the evidence is material to guilt or punishment. Id. Evidence is "material" only if there is a "reasonable probability of a different result," which exists when confidence in the outcome of the trial is undermined. Kyles v. Whitley, 115 S.Ct. 1555, 1556 (1995).
 
 
 20
 None of the material Brebner requests is material. We are not entirely convinced that the memoranda, diary, or FBI manual are material to Brebner's "guilt or innocence," since they are relevant only to his outrageous government conduct claim which would not seem to bear on his culpability. Even assuming it did, we do not find that any of these requested documents create a "reasonable probability of a different result." The FBI's manual could not change the result, since violation of a manual's policy does not constitute outrageousness. See Cuervelo, 949 F.2d at 568. In its ruling, the district court found that Brebner's outrageous conduct claim would fail even if the diary and FBI memoranda said what he claimed they did. Because we agree with the district court's evaluation of the outrageous conduct claim, see Part II, we agree that these documents would not affect the outcome of Brebner's appeal. They are therefore immaterial and need not be disclosed under Brady.
 
 IV.
 
 21
 For the foregoing reasons, the district court's dismissal of Brebner's motion to dismiss for outrageous government conduct is
 
 
 22
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Brebner claims that Turner had already started to do this, and cites three instances when Turner allegedly attempted to instigate or increase the amount of a drug buy, presumably to raise his tips. He first cites a taped conversation in which Turner chided Brebner for placing more than eight ounces of cocaine in an "eight ball" (overweighing it), and instead urged him to underweight it. Brebner next cites a conversation Turner had with one of Brebner's codefendants, Julie Polione, where Turner urged her to sell the cocaine in larger quantities so as to make more money on each individual sale. Brebner lastly cites a conversation in which James Larsen, Brebner's cocaine supplier and one of Turner's "employers," criticized Turner for selling cocaine directly to Ron Kappleman; Larsen told Turner he should have let Gary Alley, one of Larsen's middlemen, make the sale. Turner sold to Kappleman at the request of the FBI
 
 
 [2]
 Brebner also argues that this behavior violates the FBI's operations manual. Because a violation of agency policy warrants agency-imposed sanctions, and does not in itself violate due process, see United States v. Cuervelo, 949 F.2d 559, 568 (2d Cir.1991), we do not find this assertion dispositive
 
 
 [3]
 To the extent that Brebner argues that Turner's activities amounted to "money laundering," in which the FBI acquiesced, his claim still fails. Government agents can commit egregious criminal acts in the course of their investigations. See United States v. Stenberg, 803 F.2d 422, 430-31 (9th Cir.1986) (permitting agents to kill protected wildlife in order to catch poachers). Because the severity of Turner's infractions pale when compared to those in Stenberg, Turner's alleged laundering is not outrageous