UNITED STATES of America,
Plaintiff-Appellee,

v.

**Kwong Shing SO, Defendant-Appellant.**

No. 84–1060.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 14, 1985.

Decided March 1, 1985.

---

Michael Yamaguchi, John Penrose, Asst. U.S. Attys., San Francisco, Cal., for plaintiff-appellee.

Jerrold M. Ladar, Stephen W. Sommerhalter, San Francisco, Cal., for defendant-appellant.

Before BARNES and WALLACE, Circuit Judges, and STEPHENS,* District Judge.

WALLACE, Circuit Judge:

So Kwong Shing (So) appeals from his conviction on seven counts of currency violations and conspiracy in connection with a "money laundering" operation involving a Hong Kong bank and its branch office in San Francisco. The district court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

I

The Liu Chong Hing Bank, Ltd. of Hong Kong (the Hong Kong bank) has maintained a branch office in San Francisco since 1977 to serve its existing customers. This office has filed currency transaction reports (CTRs) with the Treasury Department on cash transactions over $10,000 as required by the Currency Reporting Act, 31 U.S.C. §§ 5311–5322, and its accompanying regulations. Since 1978, when codefendant Chan became the branch manager, the office has not disclosed the identity of the depositor on its CTRs if the deposit was to a corporate account.

In May 1982, Internal Revenue Service (IRS) agents began an investigation to locate and halt money laundering transactions. On May 28, a government informant, Jones, met with a former associate, codefendant Lee, who suggested that he might be able to launder money through Hong Kong. Jones arranged a meeting between Lee and undercover IRS agent Whitehead. Lee agreed to set up a Hong Kong shell corporation, Transeata Corp., to launder Whitehead's money, which Lee had been led to believe was from smuggling operations in Florida.

Lee traveled to Hong Kong to find a cooperative bank. He met with So, director of United States dollar operations at the Hong Kong bank, who proposed several alternatives to Lee but finally suggested

nominee shell corporations as the best laundering vehicle. Lee returned to San Francisco, met with Whitehead, and on July 7, 1982, the first $42,000 was deposited in Transeata's account through the San Francisco branch of the Hong Kong bank. Lee also telephoned Chan, who had been informed by So of the transaction. Chan filed a CTR, but did not disclose the individual depositor.

After the first transaction, Whitehead pressured Lee to avoid filing any CTR's in the future by making several deposits in Transeata's account on the same day of less than $10,000 each. When Chan refused to treat such deposits individually for purposes of the CTRs, Whitehead and another agent, Dyer, traveled to Hong Kong, where they met with So and a Hong Kong accountant, codefendant Lam. The agents complained of Chan's refusal to bend the filing requirements. So assured them that this would be rectified. So provided the agents with the necessary documents to set up another shell corporation, the Benrich Corporation, and negotiated a 1% personal fee. So remarked that he did not care if Whitehead and Dyer were smugglers because he had smuggler clients from Thailand and Taiwan. So also solicited future money laundry customers for a 2% fee that he offered to divide with Whitehead and Dyer as finders. At the conclusion of the meeting, So remarked: "You have just bought yourself a Chinese laundry."

After again meeting briefly with So in Hawaii, the agents returned to the mainland. Meanwhile, Chan was informed by the IRS that he had to identify the individual depositors on all CTRs, along with the corporate account holder. He subsequently proved obstructive to the Benrich conspiracy by insisting on such disclosure for the Benrich transactions. This resistance led Whitehead and Dyer to telephone So in Hong Kong, who recommended a "split deposit" approach to avoid government scrutiny. The scheme involved setting up

* Honorable Albert Lee Stephens, Jr., United States District Judge, Central District of California, sitting by designation.

numerous individual accounts in Hong Kong in the names of various cooperative Hong Kong residents and fictitious persons. Lam forwarded a package of documentation to assist in the split deposit scheme, including false depositor aliases in the names of Lam's clients. Before the package arrived, So explained the procedure to the agents on the telephone in great detail, emphasizing the deposit method was necessary to avoid scrutiny. The numerous accounts would allow the laundering of up to $500,000 per day in increments of less than $10,000 to avoid the necessity of the CTRs.

After these conversations, the laundry scheme that is the subject of this appeal went into operation. Between March 24, and April 5, 1983, seven split deposits were made without filing CTR's, in the following aggregate amounts: $62,595, $63,850, $70,925, $70,785, $79,622, $73,620, and $81,993. Although Chan was acquitted, So, Lee, and Lam were indicted and convicted on one count of violating 18 U.S.C. § 371 (conspiracy), and seven counts of violating 31 U.S.C. §§ 5313 and 5322 as implemented by 31 C.F.R. §§ 103.22 and 103.25 (1984) (failing to file a CTR), for engaging in the split deposit scheme; the previous Transeata and Benrich transactions were not charged. The first two CTR counts were charged as misdemeanors under 31 U.S.C. § 5322(a), and the last five were charged as felonies under 31 U.S.C. § 5322(b).

## II

■ So argues that the government engaged in outrageous conduct that violated his fifth amendment rights and that he was entrapped as a matter of law. These defenses, though related, focus on entirely different facts. The "outrageous government conduct" defense focuses on the government's actions, *see, e.g., United States v. Lomas*, 706 F.2d 886, 890–91 (9th Cir.1983) (*Lomas*), while entrapment focuses on the defendant's predisposition to commit the crime. *See, e.g., United States v. Marcello*, 731 F.2d 1354, 1357 (9th Cir. 1984) (*Marcello*); *United States v. Reyno-*

*so-Ulloa*, 548 F.2d 1329, 1334–36 (9th Cir. 1977), *cert. denied*, 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978) (*Reynoso*).

### A.

■ Even when a defendant is predisposed to commit an offense, his conviction may be overturned if the government is so involved in the criminal endeavor that it shocks our sense of justice and violates due process. *See United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973). Neither *Russell* nor many cases since, however, have found such conduct. The Third Circuit did so in *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978), where an agent of the Drug Enforcement Agency (DEA) solicited a former felon to open a drug laboratory, provided 20% of the chemicals, arranged favorable supply terms for more chemicals, directed the operation of the laboratory, located a production site, and solved technical problems. *Id.* at 380–81. Moreover, the two defendants had insufficient technical expertise to run the laboratory without the DEA's assistance. *Id.* at 381.

■ We can assume that our sense of justice would be shocked were "government agents [to] engineer and direct [a] criminal enterprise from start to finish." *United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir.1983). Our sense of justice is not shocked, however, when the government merely infiltrates a criminal organization, *see Marcello*, 731 F.2d at 1357, approaches persons already engaged in or anticipating a criminal activity, *see United States v. O'Connor*, 737 F.2d 814, 817–18 (9th Cir.1984), or provides valuable and necessary items to the conspiracy, *see Lomas*, 706 F.2d at 890–91.

■ In this case, the creative inspiration for the charged crimes was provided by Lee, So, and Lam. Lee made the suggestion to the government informant and also made the initial approaches to So and Chan. Moreover, Lee made the technical arrangements for depositing and forming nominee corporations. So and Lam elaborated on these arrangements by providing the de-

tailed documentation contained in the packet sent from Hong Kong. Thus, the government's conduct in this case, while providing the funds and opportunity to launder money, was clearly not "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Ryan,* 548 F.2d 782, 789 (9th Cir.), *cert. denied,* 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976), *and* 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977).

### B.

■ Entrapment, however, focuses on the predisposition of the defendant to commit a crime, and its existence is a factual issue for the jury. *See, e.g., Marcello,* 731 F.2d at 1357; *United States v. Benveniste,* 564 F.2d 335, 340 (9th Cir.1977). So contends that the district court erred in not granting his motion for an acquittal on the basis that there was insufficient evidence to find entrapment beyond a reasonable doubt.

■ We have described five factors to consider when determining predisposition: (1) the character or reputation of the defendant; (2) whether the government made the initial suggestion of criminal activity; (3) whether the defendant engaged in the activity for profit; (4) whether the defendant showed any reluctance; and (5) the nature of the government's inducement. *See United States v. Diggs,* 649 F.2d 731, 739 (9th Cir.), *cert. denied,* 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 387 (1981); *Reynoso,* 548 F.2d at 1336. The record indicates a dispute on several of these factors which the jury properly resolved. First, the evidence suggests that Lee, rather than the government, initially suggested criminal activity and initially contacted the Hong Kong bank. Moreover, So negotiated a personal fee for laundering services, thus supporting an inference of a profit motive. The most important factor, however, is the defendant's lack of reluctance. *See, e.g., Reynoso,* 548 F.2d at 1336 & n. 11. So appears to have entered the transactions with relish and expertise, providing technical advice and documentation, while boasting of his ability to launder money for smugglers in various parts of the world. The only party who displayed reluctance, Chan, was acquitted. On the basis of the disputed issues of fact in the record, therefore, the issue of entrapment was properly decided by the trier of fact. The evidence was more than ample for the jury to find against So on this issue.

### III

So argues that his convictions for five felonies under 31 U.S.C. §§ 5313 and 5322(b) must be reduced to misdemeanors. Section 5322(a) treats willful violations of the currency reporting laws as misdemeanors. *See* 18 U.S.C. § 1(1), (2). Section 5322(b), however, treats them as felonies if they are a "part of a pattern of illegal activity involving transactions of more than $100,000 in a 12-month period." Section 5322(b) is a recodification of 31 U.S.C. § 1059, *see* 31 U.S.C. § 5322 note, and was not intended to and did not change the substance of the original section 1059. *See United States v. Booky,* 733 F.2d 1335, 1337 n. 3 (9th Cir.1984); H.R.Rep. No. 651, 97th Cong., 2d Sess. 3, *reprinted in* 1982 U.S.Code Cong. & Ad.News 1895, 1897.

The first two substantive counts of So's indictment were charged as misdemeanors because neither of the first two split deposits individually exceeded $100,000 and the cumulative total of the deposits did not exceed that amount until after the second occurrence of the split deposits. The last five counts, however, were charged as felonies because the later split deposits amounted to a pattern of violations after the cumulative deposit total had exceeded $100,000.

We must initially decide whether individual currency misdemeanors aggregating to more than $100,000 amount to separate felonies each time the violation in a pattern adds to a total exceeding $100,000. In *United States v. Beusch,* 596 F.2d 871 (9th Cir.1979) (*Beusch*), we concluded that a series of currency misdemeanors will "constitute felonious activity" if they form a

pattern and exceed $100,000 in a twelve-month period. *Id.* at 878. We also recognized the strong policy of imposing severe sanctions on persons who repeatedly violate the reporting statute. *Id.* at 879. But because we reversed the dismissal of the felony indictment and remanded to determine whether a pattern existed, *id.*, we did not reach the specific issue presented in this case whether multiple felonies can be charged from one pattern.

Only one circuit has squarely faced this question of statutory interpretation. In *United States v. Kattan-Kassin*, 696 F.2d 893 (11th Cir.1983) (*Kattan-Kassin*), the Eleventh Circuit concluded that "each violation could be prosecuted as a separate felony." *Id.* at 898. The defendants in that case were charged with nine felony counts for a series of violations of section 1059(2), *id.* at 894–95, the former codification of 31 U.S.C. § 5322(b). The court analyzed the legislative history and language of the statute, and concluded that Congress intended to punish severely serious, continuing violations of section 1059. *Id.* at 896–97. Moreover, the court concluded that the language providing liability for transactions entered into as "part of" a pattern, rather than liability for the entire "pattern," evidenced congressional intent to make each transaction a separate violation. *Id.* at 896, 898.

We are not unmindful of the general rule that a single transaction with one illegal purpose cannot be divided into multiple offenses without a clear mandate from Congress. *See, e.g., Bell v. United States*, 349 U.S. 81, 84, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955); *Kattan-Kassin*, 696 F.2d at 898. We conclude, however, that the mandate in this statute is clear. The legislative history indicates that Congress intended to punish severely those who repeatedly violate this statute to prevent the statute's fines from merely becoming a cost of running a currency laundry. *See* H.R.Rep. No. 975, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad.News, 4394, 4395–97, 4406.

The Eleventh Circuit's analysis is persuasive. If we adopted So's interpretation of the statute, a violator who "committ[ed] two violations involving more than $100,000 ... would be immune from prosecution under Section [5322(b)] for the remainder of the twelve-month period." *Kattan-Kassin*, 696 F.2d at 896. Moreover, *Kattan-Kassin* is more consistent with our analysis in *Beusch*, in which we reversed a district court that had adopted So's interpretation of the statute. *Beusch*, 596 F.2d at 878. Therefore, we conclude that under this statute, subsequent deposits in violation of the reporting requirements that are part of a pattern exceeding $100,000 may be charged as felonies once the $100,000 threshold has been reached.

## IV

Finally, So argues that because section 5322(b) is subject to different interpretations, it is unconstitutionally vague on its face. But the statute is subject only to "as applied" review because section 5322(b) is not impermissibly vague in all its applications. *See Schwartzmiller v. Gardner*, 752 F.2d 1341, 1346–47 (9th Cir.1984). Even So admits the statute is sufficiently definite to subject him to one felony count.

So's argument that the statute provides insufficient notice for multiple felony convictions lacks merit because of our reading of the legislative history as clearly mandating that result. Thus, even if the bare language of the statute leaves some doubt, the language as narrowed by the legislative history clearly envisioned his conduct. *See Kattan-Kassin*, 696 F.2d at 895 (summarily rejecting a void for vagueness challenge to section 1059(2)).

AFFIRMED.