**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Richard Lee WILEY,
Defendant-Appellant.**

No. 85–5107.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 8, 1986.

Decided July 16, 1986.

Sharon McCaslin, Joyce Karlin, Asst. U.S. Attys., Los Angeles, Cal., for plaintiff-appellee.

**4.** In our discretion we do not award attorney fees or costs. 29 U.S.C. § 1132(g) (1982).

Yolanda Barrera Gomez, Elsa Leyua, Deputy Federal Public Defenders, Los Angeles, Cal., for defendant-appellant.

Before KENNEDY, SCHROEDER and FERGUSON, Circuit Judges.

KENNEDY, Circuit Judge:

Appellant Richard Lee Wiley appeals his conviction for conspiracy to possess and distribute marijuana in violation of 21 U.S.C. § 846. He argues that the district court erred in denying his motion to dismiss his indictment on the ground of outrageous government conduct. We affirm.

The essence of appellant's outrageous conduct claim is that the government was too active in suggesting a marijuana transaction and providing both an undercover courier and the contraband itself. We find nothing improper in the government's activation of the smuggling scheme. Given the difficulties of penetrating contraband networks in prisons, we cannot with confidence say the government's conduct here warrants dismissal of the indictment.

In the fall of 1982, an inmate informant at the Federal Correctional Institute at Lompoc gave prison authorities information on escapes, weapons, and drug trafficking. In early 1983, an associate warden asked the informant to find out about drug use at the prison. By telling inmates that he had access to a pound of marijuana and needed someone to smuggle the contraband inside the prison, the informant learned that Wiley could arrange the delivery. The informant met with Wiley various times to engage his participation in the drug transaction and further offered to finance the deal. After sampling some of the marijuana, Wiley agreed to help bring it into the prison in exchange for being allowed to keep one ounce himself.

As originally conceived, the plan was to deliver the marijuana to a courier who would transfer it in turn to Wiley's long-time contact, Garbiso, the prison cook. Garbiso would be responsible for smuggling the marijuana into the prison itself. Wiley suggested to the informant that Garbiso knew Wiley had a girlfriend called Lee who could be trusted as the courier. The problem was that Lee and Wiley were not on good terms, so the informant suggested someone simply pose as Lee in arranging delivery of the marijuana to Garbiso. Wiley agreed and, unknown to him, the informant used the government to choose an FBI agent for Lee's impersonator. The transaction went forward, with the agent and Garbiso speaking by telephone at various times. In the course of these conversations, Garbiso talked of "doing the deal for Rico Wiley" and explained that the arrangement was for Garbiso to keep half the marijuana for himself and deliver the other half to Wiley. Garbiso said Wiley would not deceive him.

Some two months after these conversations began, the agent delivered the marijuana to Garbiso. An embarrassment arises, for at this point the government lost control over the contraband. Based on subsequent statements of Garbiso and others, it appears the marijuana, or at least Wiley's half of it, was smuggled into the prison and smoked by members of the prison population at the Sunday night movie. A tawdry ending to an investigation, however, does not mean that the courts are required, or indeed authorized, to overlook the serious criminal enterprise that preceded it.

We may dismiss a criminal indictment when government conduct is so outrageous that it violates due process. *United States v. Bogart*, 783 F.2d 1428, 1433 (9th Cir.1986); *see United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973). Because the conduct must shock the conscience, however, outrageous government conduct is not to be equated with negligence or poor judgment. Even such lesser charges are not established on this record; and even assuming we were to accept the dissent's criticisms of the government, the

government's conduct can be described in no harsher terms.

The two principal cases in the courts of appeals that dismiss indictments for outrageous conduct have only limited application. In *Greene v. United States,* 454 F.2d 783, 786–87 (9th Cir.1971), we found that a number of factors, acting in combination, constituted outrageous government conduct. There, a special investigator initiated contact with the defendants for the purpose of running an illegal bootlegging operation. For two-and-one-half years, the investigator supplied the equipment needed for the still, urged the defendants to produce the liquor, and was their only customer. The *Greene* case, moreover, was decided prior to the Supreme Court's decision in *Russell,* which held that entrapment is not of constitutional dimension, leaving only the most shocking and extreme conduct, of undefined specificity, open to constitutional inquiry. In *United States v. Twigg,* 588 F.2d 373 (3d Cir.1978), an informant set up a speed laboratory, which he financed and operated, and convinced the defendants, who had no background in chemistry, to provide minimal assistance.

■ The government's steps to activate the smuggling plan in the case before us do not present a case of misconduct at all, much less conduct that is outrageous. The drug distribution scheme between defendant and Garbiso was in existence before the government became involved; the government merely activated it. *See United States v. O'Connor,* 737 F.2d 814, 817–18 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1198, 84 L.Ed.2d 343 (1985) (government approached persons already involved in criminal activity); *United States v. McQuin,* 612 F.2d 1193, 1195–96 (9th Cir.) (per curiam) (government infiltrated criminal organization), *cert. denied,* 445 U.S. 955, 100 S.Ct. 1608, 63 L.Ed.2d 791 (1980). When the investigation commenced, the associate warden learned from the informant that Garbiso may have been involved in smuggling drugs into the prison; the informant also confirmed that Garbiso was Wiley's courier. The established

relation between Wiley and Garbiso is further illustrated by the latter's conversations with the undercover FBI agent. Garbiso spoke of "doing the deal for Rico Wiley" and made it clear that he trusted Wiley in drug transactions. By using the informant and the FBI agent posing as a courier, the government merely provided an impetus to Wiley and Garbiso to attempt once again to smuggle drugs into the prison. *See United States v. Marcello,* 731 F.2d 1354, 1359 (9th Cir.1984) (informant merely "tempted" defendants to "[take] the bait").

Under these circumstances, providing the drugs for the transaction did not constitute government misconduct either. *United States v. Lomas,* 706 F.2d 886, 890 (9th Cir.1983), *cert. denied,* 464 U.S. 1047, 104 S.Ct. 720, 79 L.Ed.2d 182 (1984); *see United States v. So,* 755 F.2d 1350, 1354 (9th Cir.1985) (providing funds and opportunity to launder money). That the smuggling was successful leads equally as well to the argument that a highly efficient scheme had to be broken as it does to the argument that the government blundered its investigation. The law is not displaced simply because some enforcement attempts go awry.

The result we reach is fully consistent with our earlier rejection of similar claims by Garbiso. *See United States v. Garbiso,* 782 F.2d 1054 (9th Cir.1986).

Defendant's conviction is AFFIRMED.

FERGUSON, Circuit Judge, dissenting:

When the government's involvement in a criminal endeavor is excessive, the government's conduct violates a defendant's Fifth Amendment due process rights and any resulting indictment must be dismissed. *United States v. Bogart,* 783 F.2d 1428, 1432–33 (9th Cir.1986); *United States v. Wylie,* 625 F.2d 1371, 1377 (9th Cir.1980) *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981). "Law enforcement conduct ... becomes constitutionally unacceptable where 'government agents engineer and direct the criminal enterprise from start to finish.'" *Bogart,* 783 F.2d at

1436 (quoting *United States v. Ramirez,* 710 F.2d 535, 539 (9th Cir.1983)). The government's conduct here was sufficiently pervasive to require dismissal of Wiley's indictment.

### I.

This is a case where the government itself planned and directed a scheme to smuggle drugs into a federal prison. The plan was so successful that marijuana was smuggled into the prison yet no evidence of the contraband was ever discovered.

In early 1983, due to an increase in drug trafficking within the Lompoc Federal Correctional Institution, an associate warden asked a prisoner informant to investigate the transmission of drugs into the prison. To start the investigation, the informant told another inmate that he had a pound of marijuana he wanted to bring into the prison. The inmate later told him that Wiley had "a mule" (a courier) willing to bring marijuana into the prison. The courier was co-defendant Garbiso, a cook at the prison.[1]

The informant sought out Wiley to discuss smuggling the marijuana. Wiley did not agree to the proposition. The informant approached Wiley several more times, offering and providing Wiley with samples of marijuana; each time Wiley refused to agree to the deal. Wiley finally agreed to help the informant in exchange for one ounce of the marijuana.

When it became apparent that Wiley could not finance the purchase of marijuana or provide a courier to get the marijuana to Garbiso, the informant offered to do both so that the transaction would go through. The informant said that he would finance the deal, although the FBI, through the DEA, actually provided the marijuana. Wiley and the informant also discussed how to deliver the marijuana to Garbiso. The FBI rejected their idea of mailing the

marijuana to Garbiso and decided that an FBI agent would personally deliver the marijuana to Garbiso. When the informant presented the personal delivery plan to Wiley, Wiley said he thought that Garbiso would prefer the courier to be someone he knew. Wiley mentioned that Garbiso had seen a picture of his girlfriend, Lee, and would not be suspicious of her. However, since he had not talked to Lee in "a couple of years," the informant agreed to find someone to pose as Lee. An FBI agent played the role of Lee.

Once the arrangements were made, the government set the drug smuggling plan in motion. At the informant's request, Wiley wrote out instructions for Lee to contact Garbiso. Initially, Lee had difficulty contacting Garbiso, so, at the informant's suggestion, Wiley obtained Garbiso's home telephone number. Lee then made and recorded several telephone conversations to Garbiso to arrange the delivery.[2]

In February 1984, when the marijuana still had not been delivered, the informant became nervous. He was afraid that the transaction would not occur, and that his informant status would be discovered. In order to ensure completion of the deal, he told Wiley that he was going to be transferred to another prison "any day" because of a court date. Although the informant did not have a scheduled court date, as part of his cover, he was transferred from Lompoc on February 21, 1984.

Lee delivered the marijuana to Garbiso in late February 1984. There is evidence, from subsequent telephone conversations between Lee and Garbiso, that Garbiso delivered one half of the marijuana to Wiley. Prison authorities never found evidence of the marijuana in the prison.

### II.

Wiley's conviction should be reversed and the indictment dismissed because the

---

**1.** Garbiso also was convicted on the drug smuggling charge. He separately appealed. *See United States v. Garbiso,* 782 F.2d 1054 (9th Cir.1986) (mem.).

**2.** The district court found that these conversations revealed that Garbiso was familiar with

drug trafficking, that he thought the deal was between Wiley and himself, and that they would split the marijuana 50–50. As the FBI agent who posed as Lee testified, they also include Garbiso's statement that he had not seen or talked to Wiley in four months.

government's involvement in smuggling marijuana into the prison was excessive. The outrageous government conduct defense depends on the level of the government's involvement in the crime. *United States v. So,* 755 F.2d 1350, 1353 (9th Cir. 1985). Outrageous government conduct exists when "the Government permits itself to become enmeshed in criminal activity from beginning to end." *Greene v. United States,* 454 F.2d 783, 787 (9th Cir.1971). However, isolated conduct such as infiltrating an existing criminal enterprise, *United States v. O'Connor,* 737 F.2d 814, 817–18 (9th Cir.1984), supplying part of the contraband, *United States v. Russell,* 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973), or providing a person to assist in committing the crime, *United States v. McQuin,* 612 F.2d 1193, 1196 (9th Cir.), *cert. denied,* 445 U.S. 955, 100 S.Ct. 1608, 63 L.Ed.2d 791 (1980), is not shocking and outrageous and thus does not violate a defendant's due process rights. *See United States v. Bogart,* 783 F.2d 1428, 1437–38 (9th Cir.1986) (collecting cases).

We should not countenance the government's conduct here, because it engaged in all of these activities, not just one. The government initiated the transaction through an informant who claimed to have access to marijuana outside the prison; the informant approached Wiley several times to convince him to agree to help smuggle the marijuana into the prison; the informant offered to finance the purchase; the FBI supplied the marijuana; the FBI supplied the courier to deliver the marijuana; and the informant fabricated a reason to speed up, and thus ensure consummation of, the transaction.

The government's orchestration of the drug smuggling scheme compares to the level of government activity that this court,

and others, have found so excessive as to constitute outrageous conduct. In *Greene,* 454 F.2d at 786–87, this court reversed a conviction because a government informant helped to reestablish and sustain a bootlegging operation over the course of two years. Not only did the government agent initiate the operation with the defendants, from whom he previously had purchased illegal alcohol,[3] but he also offered to provide the equipment, the site, and an operator, and did provide the sugar. Additionally, he applied pressure to the defendants to begin production and was the operation's only customer.[4] *Id.*

Similarly, in *United States v. Twigg,* 588 F.2d 373, 380 (3d Cir.1978), the court reversed the conviction because the government's involvement in conceiving and contriving the crime reached "a demonstrable level of outrageousness." There, at the request of the DEA, an informant contacted the defendants about setting up a methamphetamine hydrochloride ("speed") laboratory. Although it was unclear whether the defendants had the money to purchase the chemicals or equipment, the government provided the supplies. When the defendants ran into difficulties finding an acceptable site, the government provided an isolated farmhouse. The court concluded that the government generated new crimes merely to press criminal charges against the defendant: "fundamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution for a crime so fomented by them will be barred." *Id.* at 381.

As in *Greene* and *Twigg,* the crime here would not have occurred without the government's initiation and completion of the illegal transaction. The district court found:

---

**3.** Indeed, several years earlier the defendants pled guilty to crimes similar to those alleged in *Greene.* The informant operated as the buyer in both instances.

**4.** The government attempts to distinguish *Greene* by emphasizing the two-year duration of the scheme as compared to the three months here. Duration, however, was only one of the

factors the *Greene* court relied on—that alone did not change the essential character of the government's involvement as being "from beginning to end." 454 F.2d at 787. In fact, "duration" cuts the other way here—it was the informant's conduct that accelerated the transaction to ensure the commission of a crime in the short time period.

In sum, the government supplied three critical elements of the transaction upon which the indictment was based: the money, the drugs, and the courier. However, the mule, or Garbiso, was equally indispensable to completion of the smuggling. There was no government contact with Garbiso at all;[5] and there is substantial evidence that Wiley and Garbiso had been engaged in trafficking apart from [the informant's] involvement. There is no evidence of coercion or undue pressure applied by [the informant], or that Garbiso was not predisposed. Clearly he was.[6] Despite testimony by Wiley that he did not want to get involved with [the informant], it is not credible.

Wiley's predisposition, however, is irrelevant to the outrageous government conduct defense. *See Greene v. United States*, 454 F.2d 783, 786 (9th Cir.1971). The record does not support a finding, and the district court did not find, that Wiley was part of an ongoing drug smuggling enterprise. In fact, the evidence suggests the absence of an established drug-smuggling operation. In a recorded conversation Garbiso indicated he had not seen or talked to Wiley in at least four months. When Lee could not contact Garbiso according to Wiley's original directions, Wiley did not have an immediate alternate plan: the informant had to suggest that Wiley obtain Garbiso's home telephone number. *Compare United States v. Batres-Santolino*, 521 F.Supp. 744, 752 (N.D.Cal.1981) (outrageous government conduct found when defendants, although somewhat culpable, were not embarked or about to embark on criminal activity until government set operation in motion), *with Russell*, 411 U.S. at 432, 93 S.Ct. at 1643 (no outrageous government conduct when informant contributed propanone to illegal manufacturing of drugs already in progress), *and O'Connor*, 737 F.2d at 817–18 (no outrageous government conduct when defend-

ants called former partner, now informant, to complete a drug deal and she agreed to trade cocaine for stolen jewelry).

If there had been an ongoing drug smuggling enterprise between Wiley and Garbiso, which the government merely activated, I would vote with the majority. But the record does not show such an enterprise, and the statement of the majority that there was one, does not make it so. Because the existence of an ongoing enterprise would be dispositive of the defense, it is certain that the district court judge would have found one if the evidence supported that conclusion. As an appellate court our responsibility is to base our decision only on the evidence in the record.

The fact remains that the informant approached Wiley with a plan to smuggle in one pound of government-financed and government-provided marijuana. Wiley's participation was to provide the name of a "mule" and instructions for Lee, the FBI courier. Without the government's supplying the marijuana, which Wiley could not afford, and the courier, which Wiley could not provide, Wiley's participation alone would not have resulted in this crime. *See Twigg*, 588 F.2d at 381; *Greene*, 454 F.2d at 787. Because the government engineered, directed, and manufactured this crime from start to finish, I would reverse the conviction and dismiss the indictment.

**5.** This statement is not accurate because Lee, the FBI courier, contacted Garbiso several times.

**6.** Whether Garbiso was predisposed is less relevant to Wiley's defense than is Wiley's predisposition.