**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Salvador FRANCO; Francisco J.
Herrera–Flores, Defendants–
Appellants.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jose Eliodoro TOPETE, Defendant–
Appellant.**

Nos. 95–50615, 96–50029 and 96–50021.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 8, 1997.

Argued by Video–Conference Call
and Submitted Aug. 13, 1997.

Decided Feb. 11, 1998.

**624**

Gerald Werksman, Newport Beach, CA; William J. Genego, Santa Monica, CA; Yolanda M. Barrera, Los Angeles, CA, for defendants-appellants.

J. Daniel McCurrie, Assistant United States Attorney, Santa Ana, CA, for plaintiff-appellee.

Before: CANBY and THOMAS, Circuit Judges, and KING,* District Judge

CANBY, Circuit Judge:

Salvador Franco, Jose Eliodoro Topete, and Francisco Herrera–Flores appeal their jury convictions for possession of methamphetamine with intent to distribute, a violation of 21 U.S.C. § 841(a)(1). Franco and Topete also appeal their convictions for conspiracy to distribute methamphetamine, a violation of 21 U.S.C. § 846. Topete also challenges his sentence under the Guidelines. We affirm the judgments of the district court in all respects.

---

\* Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

## BACKGROUND

In early 1994, one Macario Ayala contacted Osvaldo Garcia, a confidential informant for the Drug Enforcement Administration ("DEA"), for the purpose of introducing him to some persons who were interested in selling narcotics. Ayala took Garcia to a "Frames Plus" furniture shop, where he introduced Garcia to appellant Franco, the owner of the shop, and Efren Gonzalez, Franco's nephew. This meeting was the first of many in which Garcia wore a body wire and recorded conversations with the defendants and their co-conspirators. Franco and Gonzalez discussed selling Garcia 30 kilograms of cocaine and 10 pounds of methamphetamine. Garcia told Gonzalez and Franco that he could supply them with ephedrine and hydriodic acid, precursor chemicals used to create methamphetamine. During the ensuing days, Garcia supplied Franco and Gonzalez with samples of precursor chemicals, and Franco and Gonzalez gave Garcia a sample of methamphetamine. Franco and Gonzalez referred to the source of the methamphetamine as "Lolo," appellant Jose Topete, and said that Lolo was working with another supplier, "Nacho," who the government alleged was appellant Francisco Herrera–Flores ("Herrera").

The next day Garcia was introduced to Topete at Franco's shop. Topete agreed to provide Garcia with nine pounds of methamphetamine in return for 55 pounds of ephedrine. This exchange was effectuated a few days later between Gonzalez, purportedly acting on behalf of Topete, and Garcia. Garcia later arranged to purchase 40–80 pounds of methamphetamine from Topete and Gonzalez.

On the morning that this large shipment was to be delivered, Herrera, Topete, Gonzalez and Franco all met at a residence in Azusa owned by Topete. After some delay, Herrera left and drove his car to a strip mall where he met Jose Reyes–Ramos ("Reyes"). There a detective saw Reyes take a box from Herrera's car and place it in Reyes' pickup truck. (At trial, the detective described it as

a brown cardboard box with red lettering; Herrera testified that it was a tool-box). Herrera and Reyes then drove the pickup truck to the Azusa residence. Shortly thereafter, Gonzalez drove the pickup truck to Franco's shop, followed by Franco in a van. After a stop at the shop, Gonzalez drove the van to Garcia and delivered the van, containing two cardboard boxes holding a total of 55 pounds of methamphetamine. Gonzalez was then arrested, and the remaining defendants were arrested shortly thereafter.

Franco, Topete, and Gonzalez were convicted of conspiracy to possess and distribute methamphetamine, and of possession of methamphetamine with intent to distribute. Herrera was convicted of possession of methamphetamine with intent to distribute. Reyes was acquitted of the same charge. Franco, Topete and Herrera now appeal.

## ANALYSIS

### I. The Transcripts.

#### a. Sending unread transcripts into the jury room.

■ The government's investigation into the methamphetamine conspiracy produced audio tape-recordings of approximately 110 conversations, telephonic and face-to-face, between Garcia, Franco, Gonzalez, and Topete. All of those conversations were conducted solely in Spanish. The recordings themselves were placed in evidence but not played for the jury. English-language transcripts were also placed in evidence, but only 18 of them were read in full to the jury. All 110 transcripts were, however, made available to the jury during its deliberations.

Appellants collectively contend that the district court's decision to allow the jury to take the unread transcripts of the tape-recorded conversations into the jury room was structural error, requiring reversal under the principle we established in *United States v. Noushfar*, 78 F.3d 1442 (9th Cir.1996). We conclude that the rule of *Noushfar* does not apply in the circumstances of this case.

In *Noushfar*, the district court had admitted into evidence, but had not played for the jury, several taped conversations (recorded in English). Over objection, the court sent the tapes and a tape-player into the jury room. We held that, in so doing, the district court committed structural error, requiring automatic reversal. We pointed out that we had previously held it to be a violation of Fed.R.Crim.P. 43(a) for a jury to *replay* without the presence of the defendant a tape that had earlier been heard in open court. *See United States v. Kupau*, 781 F.2d 740, 743 (9th Cir.), *cert. denied*, 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 45 (1986). We then opined that the error in *Noushfar* was far more serious:

> The court completely abdicated control of the presentation of the evidence. It made no analysis of whether undue emphasis might be placed on some of the recorded conversations. The court gave no instruction that the jurors must listen to the tapes in their entirety in accordance with the rule of completeness and Fed.R.Evid. 106. And this error undermines one of the most fundamental tenets of our justice system: that a defendant's conviction may be based only on the evidence presented during the trial. Sending the tapes to the jury room is akin to allowing a new witness to testify privately, without cross-examination, to the jury during its deliberations.

*Noushfar*, 78 F.3d at 1445.

Noushfar is different from our case, however, for at least two reasons. First, and most important, the trial court in *Noushfar* had sent the unplayed tapes to the jury "[o]ver vigorous objections." *Id.* at 1444. Here, there was no objection to the district court's decision to send the unread transcripts to the jury room and, for reasons we will explain, prior motions or inquiries of defense counsel did not suffice in place of such an objection.

Second, *Noushfar* involved the sending of unplayed tapes to the jury. Our case involves the sending of unread transcripts to the jury, when the tapes were not played because they were in a foreign language. This distinction alone does not necessarily render *Noushfar* inapplicable to the present situation, but it highlights the need for explicit objections. To explain why we conclude that *Noushfar* does not require rever-

sal here, it is necessary to describe in more detail both the procedural situation in the district court and the state of our law.

The district court gave the defendants abundant time to review the English-language transcripts and the tapes. It informed the defendants that, to the extent that they did not succeed in securing the government's consent to suggested corrections, they should submit competing translations of disputed passages. Although the defendants did succeed in making numerous agreed corrections, they submitted no competing translations. The district court accordingly was quite correct in concluding that the defendants had not placed the accuracy of the transcripts in issue. *See United States v. Cruz,* 765 F.2d 1020, 1023 (11th Cir.1985) (failure to submit own translation precludes attack on accuracy of transcript on appeal); *United States v. Armijo,* 5 F.3d 1229, 1234–35 (9th Cir.1993) (opportunity of defense to introduce alternative versions is factor in admissibility of transcripts).

█ The district court also correctly held that the relation between tapes and transcripts changes when the tapes are in a foreign language. When tapes are in English, they normally constitute the actual evidence and transcripts are used only as aids to understanding the tapes; the jury is instructed that if the tape and transcript vary, the tape is controlling. *See United States v. Turner,* 528 F.2d 143, 167–68 (9th Cir.1975), *cert. denied,* 429 U.S. 837, 97 S.Ct. 105, 50 L.Ed.2d 103 (1976). When the tape is in a foreign language, however, such an instruction is "not only nonsensical, it has the potential for harm where the jury includes bilingual jurors." *United States v. Fuentes–Montijo,* 68 F.3d 352, 355–56 (9th Cir.1995). We therefore have upheld a trial court's instruction that a jury is not free to disagree with a translated transcript of tape recordings. *See id.* To some degree, the status of translated transcripts as primary evidence helps the defendants' argument: the transcripts substitute for the tapes, and accordingly it is reasonable to presume that they will be read in open court as a tape would be played in open court, rather than being treated as ordinary documentary evidence such as a contract or insurance policy.

The district court in the present case did not treat the transcripts as ordinary documentary evidence. In response to the requests and a motion of the defendants to have the tapes played to the jury or to have neutral readers read the transcripts to the jury, the district court set forth a detailed pretrial ruling. The court declined to play representational tapes so that the jury could derive meaning from the tone or inflection of the speech, because, in the court's view, the tone or inflection of a foreign language would be meaningless or misleading. The court rejected neutral readers because they could inject emphasis or distortion into the process. The court stated that, instead, the procedure would be as follows:

> First, both tapes and transcripts will be received into evidence, and the jury will be instructed they may listen to the tapes if they so request during their deliberation. The English translation transcripts will be published to the jury when the government proceeds with its direct examination of the confidential informant.
>
>    \*     \*     \*     \*     \*     \*
>
> ... As soon as the transcript is published and before the examination begins, the Court will instruct the jury to read the entire transcript silently. The Court will pause for the jurors to accomplish that reading.

The court also announced that it would, and it did, give the jury the following instruction regarding the tapes and transcripts:

> The words which were spoken at the time the conversations were recorded is the real evidence. However, because the words were spoken in Spanish, transcripts of English translations are also received into evidence. These transcripts are like any other evidence. That is, you must consider all the evidence received in the case as a whole and not place undue emphasis on the transcripts. The transcripts are evidence subject to objections. The transcripts or portions of the transcripts may have to be evaluated by you for accuracy, and you may accept, reject, or partially accept and reject the transcript's accuracy.

The tapes will be received into evidence. If during your deliberations you desire to hear a tape played, you may so request.

The district court then asked counsel whether they were willing to stipulate to the above procedure, and counsel did so stipulate. The court also stated that, if defendants wished to play specific portions of the tapes during their defense, they would have to raise that issue at the time and the court would rule.

Eighteen of the transcripts were read in full by the jury. The court was careful to note for the record that it had observed the jury reading the transcripts, the time that it took, and that all the jurors had completed their reading.

■ Most of the transcripts, however, were admitted in evidence but not read in court by the jury. Topete's attorney, who acted as lead for the defense, raised the issue:

MS. BARRERA: I must have misunderstood the Court's ruling because I thought any exhibit that was introduced by way of a transcript the jury would be asked to read. . . .

THE COURT: The Court made its ruling very clear. The Court will stand on the record made. The Court is not inclined to go back and repeat the entire ruling. Counsel is proceeding consistent with the ruling.

If nothing further had occurred at trial, this rather tentative inquiry might serve as an objection to the failure to have all of the transcripts read by the jury in open court, but there were further developments. Lead defense counsel later asked the court whether, when she cross-examined on transcripts that had not been read by the jury, it was necessary for the jury to read the entire transcript. Counsel stated that "[o]ur preference would be not necessarily to have them read, rather to just simply examine by referring the jury and Mr. Garcia to certain portions, certain pages or paragraphs, without actually asking the jury to read them." The court said that it thought that was a good approach.

The prosecutor then stated that he believed the court was allowing the defense to use the transcripts differently from the prosecution: "I wasn't allowed to go through exhibits even after they were admitted and highlight certain portions without having published the entire exhibit to the jury." The court answered that it "gave an extensive ruling. The ruling stands. The Court is applying the ruling consistently." The court thereafter allowed the prosecutor to question on portions of transcripts without having the entire transcript read by the jury, even though the prosecutor stated that he had not known that he was allowed to do that. The defense interposed no objection at this point.

The following day, the court clarified that, in fact, it had modified its pretrial ruling regarding the jury's reading of the tapes in full. The court stated to the prosecutor:

[Y]ou made a point about, Mr. McCurrie, yesterday your understanding that the jurors were to read to themselves an entire transcript before you then began asking questions about it. I reviewed the limiting instruction which I gave and to which all counsel stipulated, and that was the instruction.

The difference with respect to Exhibits 107, 108, 109, and 110 was that Ms. Barrera on behalf of the defense suggested that the defense preference at this point was to refer to selective passages with respect even to certain transcripts that had not been read in their entirety.

When the Court wrote the proposed limiting instruction to which all counsel stipulated, that was in response to a number of motions in limine primarily from the defense with some minor contribution from the government, and the defense position was to-was several pronged but always included the position that the transcripts were-the tapes were to be played in their entirety or the transcripts to be read in their entirety, so that was the reason the limiting instruction was written as it was to which everyone stipulated, and the modification was after the defense's suggestion.

This statement made it clear that the court was changing its original ruling because the defense was now content not to have all of

the transcripts read in full by the jury in open court. No objection or other comment was offered by the defense at this point. The court subsequently made clear to defense counsel that they could have the jury read the entire transcript of any conversation upon which they were cross-examining if they so wished.

Finally, the court reiterated the instruction it gave the jury when the transcripts were first introduced, advising the jury that the "transcripts are like any other evidence. That is, you must consider all the evidence received in the case as a whole and not place undue emphasis on the transcripts." The court then sent all of the admitted transcripts, including the ones not read by the jury in open court, into the jury room. There was no objection from defense counsel. The tapes were not sent into the jury room, but the jury was advised that it could listen to tapes upon request; no request was made.

On this record, we conclude that the district court committed no reversible error in failing to have the jury read all of the transcripts in open court, or in sending all of the transcripts to the jury room. Although the court deviated from its original ruling that contemplated the jury's reading all of the admitted tapes in full, defense counsel appear to have acquiesced in the deviation. Once the failure to read the transcripts in open court is excused, we find no abuse of discretion in sending the transcripts to the jury room when there is no cognizable dispute concerning the accuracy of the translation. *See United States v. Taghipour,* 964 F.2d 908, 910 (9th Cir.), *cert. denied,* 506 U.S. 899, 113 S.Ct. 283, 121 L.Ed.2d 210 (1992).

It is not unprecedented for a trial court to send translated transcripts to the jury room without having them read in full in open court. In *United States v. Pena–Espinoza,* 47 F.3d 356 (9th Cir.1995), we held that, although it was not a preferred procedure, a district court did not commit reversible error in permitting readers merely to read summaries of translated transcripts of tape recordings, rather then the entire transcripts. *Id.* at 360. The full transcripts were made available to the jury during its deliberations. *Id.* The point of contention in *Pena–Espino-*

za was that the summaries allegedly contained distortions and editorializing, *see id.;* no such infirmity existed in our case. While it is still not a preferred procedure to send translated transcripts into the jury room when they have not been read to or by the jury in open court, that occurrence similarly did not constitute reversible error in our case, in light of defense counsels' acquiescence. *See United States v. Magana,* 118 F.3d 1173, 1183–84 (7th Cir.1997) (no reversible error in sending transcripts of unplayed tapes to jury room in absence of *"specific motion"* to the contrary). Certainly the court's treatment of the transcripts in these circumstances was not an act that " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings,' " so as to merit reversal as plain error. *United States v. Olano,* 507 U.S. 725, 736, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993) (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)); *see also Johnson v. United States,* —— U.S. ——, ——, 117 S.Ct. 1544, 1550, 137 L.Ed.2d 718 (1997) (even if error is assumed to be structural, plain error review is not compelled).

**b. Declining to play the foreign-language tapes for the jury.**

We find no abuse of discretion in the district court's decision not to play the tapes in full for the jury. The tapes were lengthy and the conversations were conducted in a language that most or all of the jury did not understand. *See United States v. Bahadar,* 954 F.2d 821, 830–31 (2d Cir.1992). The defendants argue that one transcript misidentified one of the defendants, and the failure to play the tape prevented the jury from recognizing this fact. Appellants, however, have waived their argument concerning the identity of the speakers on particular tapes. All appellants stipulated to the authenticity of the tapes, and the court specifically defined authenticity to mean that, with respect to each tape, "it's in fact a conversation between the persons indicated on the English translation on the date so indicated."

The defendants also contend that failure to play the tapes inhibited their cross-examination of the translator, particularly in regard

to Gonzales' reference in a tape to the number 458. If the reference was to Gonzalez having obtained the drugs at 4:58 in the morning, it might have tended to negate the government's evidence that drugs were transferred by Herrera and Reyes later in the day. (There were, however, two packages of drugs). Defense counsel, however, did vigorously cross-examine the translator on this point, and she stated that she did not know why she translated the number as a number rather than as a time of day. We fail to see how playing the tape in Spanish would have aided defense counsel on this point. They offered no counter-translation when given the opportunity.

Finally, appellants argue that the district court's ruling deprived the jury of hearing the inflections in the voices of the speakers on the tapes. According to appellants, those inflections were directly relevant to Topete's defense of outrageous government conduct and to Franco's defense of entrapment—defenses that contain subjective elements. We conclude, however, that the district court did not abuse its discretion in ruling that the inflections and emphasis in a foreign language would not be enlightening to the jury, and might be misleading. Finally, the district court made clear that it would entertain requests to play specific portions of tape when proffered at the appropriate point in the proceedings; no such proffer was made.

**c. Refusing to employ neutral readers.**

■ We also find no abuse of discretion in the district court's refusal to employ neutral readers, for fear of importing distortions of emphasis into the transcripts. The district court's procedure of having the jury read the transcripts under the watchful eye of the court was within its discretion.

In sum, then, we conclude that the district court committed no reversible error in connection with the tape and transcript evidence.

**II. Outrageous Government Conduct Toward Topete.**

■ Topete contends that the district court erred in denying his motion to dismiss the indictment for outrageous government

conduct. Topete asserts that, in light of "the informant's repeated and deliberate attempts to lure him into crime by exploiting his financial difficulties, the government's conduct in this case was coercive and outrageous."

■ Topete's contention is without merit. We have previously held that "[t]he due process channel" for the defense of outrageous government conduct is "most narrow," *United States v. Stenberg*, 803 F.2d 422, 429 (9th Cir.1986), and is available only where the government "is so involved in the criminal endeavor that it shocks our sense of justice." *United States v. So*, 755 F.2d 1350, 1353 (9th Cir.1985). In general, that standard is met only when the police completely fabricate the crime solely to secure the defendant's conviction. *United States v. Emmert*, 829 F.2d 805, 813 (9th Cir.1987). No such conduct occurred here.

The evidence in the record suggests that Topete was involved in drug trafficking prior to his meeting with Garcia. Topete's coconspirators referred to Topete when they gave Garcia the first sample of methamphetamine, well before Garcia first met Topete. When they did meet, Topete told Garcia that he had access to 1–2 tons of cocaine and 100–200 pounds of methamphetamine and marijuana. Later, Topete's actions with regard to the sale of methamphetamine to Garcia demonstrated his experience with drug trafficking: he possessed firearms, pagers, and cellphones; never handled the methamphetamine himself; told Garcia that he did not want to talk on the phone; and had drug-related forfeiture documents in his Lexus. That evidence of independent, continuing criminal activity is itself sufficient to dispense of Topete's contention that the government's conduct was outrageous. *See United States v. Wiley*, 794 F.2d 514, 516 (9th Cir. 1986) (no outrageous conduct where government merely activated scheme already in existence). Finally, the government did not create the criminal activity; although Garcia supplied ephedrine to the conspirators, he did not do so until after the conspirators had already produced methamphetamine. *See Emmert*, 829 F.2d at 813.

### III. Prosecutorial Misconduct Toward Topete.

■ We also reject Topete's contention that his conviction must be reversed because of prosecutorial misconduct. The prosecutor's introduction of a letter the prosecutor wrote to a judge about the informant was stimulated by the use of the letter by the defense; it did not constitute improper vouching. Evidence relating to Topete's ownership of unsuppressed weapons (and to his lack of need for them in regard to his cockfighting business) was relevant to his alleged drug activity. *See United States v. Tarazon*, 989 F.2d 1045, 1053 (9th Cir.1993). References to Topete's unexplained wealth were similarly relevant. *See United States v. Miguel*, 952 F.2d 285, 289 (9th Cir.1991). We find no merit in Topete's other claims of improper prosecutorial conduct.

### IV. Entrapment of Franco.

■ Franco contends that the district court erred in declining to hold that he was entrapped as a matter of law. We will not disturb the jury's finding of guilt if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A factual dispute concerning inducement and predisposition precludes a finding that the defendant was entrapped as a matter of law. *United States v. Davis*, 36 F.3d 1424, 1430–1431 (9th Cir.1994). There was such a factual dispute in Franco's case.

First, although Franco claims that the government induced him to become involved in the methamphetamine conspiracy by taking advantage of his desperate financial situation, Franco was introduced to Garcia by Ayala, who was not working for the government. Entrapment by Ayala would not constitute a defense. *See id.* Moreover, Franco's claim that Garcia took advantage of his financial desperation was contradicted by evidence that Franco possessed significant assets, including a working business. Indeed, the loan he claimed to be desperate to repay had been extended into 1995 for repayment.

Second, although Franco claims that he was not predisposed to become involved in the methamphetamine conspiracy, he participated directly in delivery of the first, high-quality sample of methamphetamine to Garcia, he mentioned having multiple suppliers of methamphetamine, and made numerous statements about his drug business. Finally, an extra sample of methamphetamine was found at Franco's furniture shop, and the furniture shop itself was used in the course of the drug deal. In light of all of this evidence, Franco was not entitled to a finding of entrapment as a matter of law.

### V. Sufficiency of Evidence to Convict Herrera; Inconsistent Verdicts.

■ Herrera contends that there was insufficient evidence to convict him. The government, however, offers several facts in evidence sufficient to support conviction, including: Herrera's participation in the meeting of conspirators on the day of the final, major transfer of drugs; Herrera's regular telephone contact with Topete; Herrera's delivery to Reyes' pickup of a box described as one later found to contain methamphetamine; Herrera's possession of military-style weapons; the quantity and purity of the methamphetamine transported by Herrera, which made his knowledge likely. This evidence was sufficient. *See, e.g., United States v. Rodriguez–Ramirez*, 777 F.2d 454 (9th Cir.1985); *United States v. Segura–Gallegos*, 41 F.3d 1266 (9th Cir. 1994).

■ Herrera argues, however, that the evidence should be regarded as insufficient in light of the fact that he was acquitted of conspiracy, and his conviction for possession with intent to distribute makes little sense if it was not part of the conspiracy. But, when the evidence is otherwise sufficient to convict, a defendant cannot successfully challenge his conviction on one count on the ground that it is inconsistent with his acquittal on another count. *United States v. Powell*, 469 U.S. 57, 64–69, 105 S.Ct. 471, 476–79, 83 L.Ed.2d 461 (1984).

Herrera argues even more strongly that his conviction should be reversed in light of

the acquittal of Reyes. He and Reyes handled the same box; Herrera argues that he can scarcely be guilty if Reyes was innocent. Herrera relies on our statement in *United States v. Marchini,* 797 F.2d 759 (9th Cir. 1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1288, 94 L.Ed.2d 145 (1987), that "a conviction of one defendant and an acquittal of the other when the only evidence of culpability applies equally to both may violate due process unless there is an articulation of a rational basis for dissimilar treatment." *Id.* at 765. Here, however, the jury could rationally have decided, in light of Herrera's other connections to the conspirators, that he knew the package that he brought to the scene in his car contained drugs, but that Reyes had no way of knowing that it did. *See United States v. Guzman,* 849 F.2d 447, 449 (9th Cir.1988). There is no violation of due process, and no insufficiency of evidence.

## VI. Prejudice to Herrera from Instruction on Use of Firearm.

 Herrera was convicted of use of a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c). The conviction was vacated on motion of the government after the Supreme Court's decision in *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) (mere availability of weapon not sufficient to constitute use). Herrera contends that the district court's pre-*Bailey* jury instruction might have led the jury to believe that the presence of a firearm made it more likely that he committed the drug offense. We find no error. Evidence of possession of firearms, even if insufficient to convict under § 924(c), is nevertheless relevant in showing Herrera's involvement in drug trafficking. *See United States v. Tarazon,* 989 F.2d at 1053. There was no unfair spillover effect.

## VII. Sentencing Issues; Topete.

The district court did not commit clear error in adjusting Topete's offense level upward on the ground that he was a "manager or supervisor . . . and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). Topete stated to Garcia that he was "the only one that was answering for this merchandise." Topete had Gonzalez run an errand for him; he set up the final transaction but did not handle the drugs himself. The district court could properly find that the others acted at his direction. *See United States v. Avila,* 905 F.2d 295, 298–99 (9th Cir.1990).

We also reject Topete's contention that the district court clearly erred in denying him a downward adjustment for acceptance of responsibility. Topete never accepted full responsibility for his involvement in the drug trafficking; the district court could properly find an absence of contrition on his part.

## CONCLUSION

For the reasons stated, we find no merit in the contentions of the appellants discussed above. We have also reviewed the appellants' other assignments of error and find them to be without substance as well. The judgments of the district court are

**AFFIRMED.**